# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) |
| | ) |
| | )   No. S1-4:12-CR-97 ERW |
| | ) |
| ALIREZA BAKHTIARI, | ) |
| | ) |
|     Defendant. | ) |

## SENTENCING HEARING

### BEFORE THE HONORABLE E. RICHARD WEBBER
### UNITED STATES DISTRICT JUDGE

### NOVEMBER 19, 2012

APPEARANCES:

For Plaintiff:        Dean J. Sauer, Esq.
                    OFFICE OF THE U.S. ATTORNEY
                    111 South 10th Street, 20th Floor
                    St. Louis, MO  63102

For Defendant:        Alireza Bakhtiari, Pro Se
                    3889 Walsh St.
                    St. Louis, MO  63116

                    Andrea L. Smith, Esq.
                    715 W. Rosehill
                    Kirkwood, MO  63122

Reported By:          SHANNON L. WHITE, RMR, CRR, CSR, CCR
                    Official Court Reporter
                    United States District Court
                    111 South Tenth Street, Third Floor
                    St. Louis, MO  63102
                    (314) 244-7966

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

INDEX


WITNESSES

BRADLEY S. HILES
        Direct Examination by Mr. Sauer ................   14
        Cross-Examination by Mr. Bakhtiari ............   33

MARSHALL HOEKEL
        Direct Examination by Mr. Bakhtiari ...........   64

GLENNON FOGARTY
        Direct Examination by Mr. Sauer ...............   75
        Cross-Examination by Mr. Bakhtiari ............   82
        Redirect Examination by Mr. Sauer .............   88
        Recross-Examination by Mr. Bakhtiari ..........   90

SHARON L. WEISS
        Direct Examination by Mr. Bakhtiari ...........   94
        Cross-Examination by Mr. Sauer .................  100

MICHAEL GREGORY SALAZAR
        Direct Examination by Mr. Bakhtiari ...........  102
        Cross-Examination by Mr. Sauer .................  109
        Redirect Examination by Mr. Bakhtiari ..........  112

1    (PROCEEDINGS STARTED AT 9:05 AM.)

2    (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT AND WITH

3    THE DEFENDANT PRESENT:)

4        THE COURT:  Calling the following case:  *United*

5    *States of America v. Alireza Bakhtiari.*  Case number is

6    S1-4:12-CR-00097 ERW.

7        Is the United States ready?

8        MR. SAUER:  Yes, Your Honor.

9        THE COURT:  Is defendant ready?

10       MS. SMITH:  Yes, Your Honor.  I do have a

11   preliminary --

12       THE COURT:  All right.  I'll hear it now.

13       MS. SMITH:  First of all, Your Honor, I apologize for

14   everybody being late.  There's more -- there's enhanced

15   security in the courtroom -- I mean in the building.

16       THE COURT:  No.  That's all right.

17       MS. SMITH:  So I apologize for running a little bit

18   late.

19       Your Honor, I do make a motion to withdraw counsel at

20   this time and request that I be appointed stand-by counsel.

21   My client and I have come to an impasse on a number of

22   matters, and this case is factually complex, and Mr. Bakhtiari

23   actually has a better handle on the facts than I do.

24       I think Mr. Sauer -- I hope Mr. Sauer does not oppose

25   my motion.  I did notify him last night and sent him an email

4

1   saying that I was going to be doing this, as I did the Court

2   this morning, before court started.  So I make the motion to

3   withdraw as counsel of record and request that I be appointed

4   as stand-by counsel, Your Honor.

5         THE COURT:  Let me hear from Mr. Bakhtiari.  Go

6   ahead, sir.

7         MR. BAKHTIARI:  Yes, Your Honor.  If I may also, I

8   assert the same motion as pro se.  Earlier in the proceedings,

9   the Honorable Adelman allowed me to act as cocounsel in pro

10  se.  Now, in this juncture in these proceedings, number one,

11  because of the complexity of the facts that are behind it --

12        THE COURT:  Okay.  Now, you just hit upon a -- if

13  there are complex facts, you need a lawyer.  What makes you

14  think just because the facts are complex, you're more capable

15  of protecting your rights than a lawyer is?

16        MR. BAKHTIARI:  It's more extensiveness than complex,

17  Your Honor.  If I may correct my statement, it's extensive.

18  It goes several years back.  There are three underlying civil

19  suits.  And it's been very voluminous as far as addressing the

20  evidentiary matters of factual issues.  On that basis, if I

21  may, Your Honor, I move the Court to allow me to proceed in

22  pro se in sentencing.

23        I have submitted a sentencing brief to the Court, and

24  I'll have exhibited to the Court that I have familiarized

25  myself to the fullest extent with the sentencing terms and

5

1  also the calculation of the guidelines.

2       Having said so, Ms. Smith will not be leaving the

3  courtroom, and I will definitely utilize her existence and her

4  services if need be, but it would -- it would serve the

5  justice, Your Honor, to the best if I proceed by addressing

6  these factual and legal matters merely because it's highly

7  extensive, it goes back three years, maybe more, and we are

8  talking about three other heavily litigated civil suits that

9  have given rise to the current criminal case before the Court,

10 Your Honor.

11      THE COURT:  Well, my concern is that you're just

12 disillusioned maybe about these proceedings or, you know, any

13 time you have complex matters, you're always better off with a

14 lawyer.  Any time you have basically similar simple matters in

15 court, you're always better served by having an attorney.  We

16 are not going to have mini trials today about three prior

17 cases.  Do you understand that?

18      MR. BAKHTIARI:  That is actually one of my requests

19 before this Court, to allow the civil suits to be tried based

20 on their own merits in their own court.  And within the briefs

21 that Mr. Sauer has submitted, he has tried to address the

22 merits of the civil court suits in this court.  That is

23 actually one of my main points, to keep those out of this

24 court and address the law of the Eighth Circuit especially

25 enunciated in the Fox -- in the case of United States v. Fox

1    back in 1975, which says --

2           THE COURT:  Wait.  I don't want to get into that

3    right now.  The sentencing guidelines are extraordinarily

4    complex.

5           MR. BAKHTIARI:  Yes.

6           THE COURT:  Even the most highly trained lawyers have

7    difficulty negotiating the United States Sentencing

8    Guidelines.  Experience that I have teaches me that every time

9    someone represents or tries to represent themselves, the

10   following happens:  They find it very awkward to proceed in

11   asking themselves questions on the stand and answering the

12   questions.  If I allow narrative testimony, it frequently is

13   interrupted.  If you are unsuccessful today in your

14   representation of yourself, it always results in extensive

15   hearings later because you will claim you didn't have

16   effective assistance of counsel.  If you are unsuccessful,

17   then on appeal you may be forfeiting some of your rights.  If

18   you say things in court, it can be used against you as an

19   admission, where it would not be with your lawyer.

20          Everything I know, over thirty years of doing this,

21   suggests that anyone who represents themselves set themselves

22   up for failure, disappointment, disillusionment.  They leave

23   the court thinking they were being treated unfairly because

24   the judge was unfair with them.  I am here to give two people

25   a fair trial, the United States of America and you.  I don't

1   take sides.  I don't help you.  I'm not going to get involved

2   in representing you today.  All of those things mitigate

3   against doing what you want to do.

4          Now, having said that, you do have certain

5   constitutional rights that permit you to do that.  I think

6   it's a mistake, I think you're making a big error, and I want

7   to make sure you understand all of those things before I rule

8   on your motion.

9          MR. BAKHTIARI:  Your Honor, I am fully aware of the

10  perils and the pitfalls of self-representation.  Throughout

11  years I've come to the absolute faith through that old saying

12  that an attorney who represents himself has a fool for a

13  client.  A pro se who represents himself, a layman pro se who

14  represents himself, has a double fool for a client.  I'm fully

15  aware of that.

16         But having to choose between the lesser of the two

17  evils, I think it would serve me the best if I proceed in pro

18  se, and on the record I acknowledge that I fully am aware of

19  the perils and the downfalls of self-representation.  And I do

20  not intend to take this stand as a fact witness in this case.

21  It is my constitutional right to avoid that, and I do assert

22  that right, Your Honor.

23         And, well, I'm sure that any time I start making

24  narrative statements or to the witnesses posing statements

25  rather than questions, Mr. Sauer will dutifully object.

1      THE COURT:  All right.  Now, as I understand your

2  request, it isn't that Ms. Smith be terminated in representing

3  you.  It's she'll remain here in the courtroom to be available

4  to you if you request her assistance.  Is that what you're

5  asking?

6      MR. BAKHTIARI:  If she wishes to stay, I would

7  welcome her assistance at times, yes, Your Honor.

8      THE COURT:  Are you willing to proceed on --

9      MS. SMITH:  Of course, Your Honor, yes.

10      THE COURT:  Very well.  Well, I will permit you to

11  represent yourself.  You are now a pro se litigant in this

12  case.  You are responsible for proceeding with your case and

13  following all the rules of evidence, all the rules of criminal

14  procedure, and Ms. Smith will be here solely for the purpose

15  of helping you if you ask her a question.

16      Very well.  You may have a seat.

17      MR. BAKHTIARI:  Thank you, Your Honor.

18      THE COURT:  And I will explain the general nature of

19  the proceedings today as to how I expect to proceed.  First,

20  have you received and reviewed a copy of the presentence

21  report in this case, Mr. Sauer?

22      MR. SAUER:  Yes, Your Honor.

23      THE COURT:  I know that you have, Mr. Bakhtiari,

24  because you have filed a sentencing memorandum, so you have

25  received a copy of the sentencing guide -- of the presentence

1    report; is that correct?

2            MR. BAKHTIARI:  Yes, Your Honor.

3            THE COURT:  And I note there are objections, which I

4    will be taking up soon.  First I shall be making calculations

5    under the United States Sentencing Guidelines.  The objections

6    that are on file relate to those calculations.  The United

7    States Sentencing Guidelines were passed in 1984 but became

8    advisory on January 12, 2005, when the United States Supreme

9    Court said that they were, in part, unconstitutional.

10           I shall make calculations under the guidelines as I'm

11   obligated to do, but I will consider them only in an advisory

12   manner.  I will consider the impact of the parties' plea

13   agreement on any sentencing issues.  I will hear evidence that

14   the United States or the defendant will present.  I will hear

15   statements of counsel and of the defendant if he cares to

16   speak.  I will decide whether there should be any departure

17   under the guidelines.  I will look at all the factors under

18   18, United States Code, 3553(a) to decide whether to impose a

19   guideline sentence or a nonguideline sentence.

20           Those factors include the nature and circumstances of

21   the offense and history and characteristics of the defendant,

22   the need for the sentence imposed to reflect the seriousness

23   of the offense, to promote respect for the law, and to provide

24   just punishment for the offense, to afford adequate deterrence

25   to criminal conduct.  I'll protect the public from further

1    crimes the defendant might commit.

2         I will consider the need to provide defendant with

3    needed educational, vocational training, medical care, or

4    other correctional treatment in the most effective manner,

5    recognizing now that he has a master's degree.

6         I shall now turn to a general review of the

7    sentencing guidelines.  I'm not going to be making final

8    conclusions at this time until after I consider the

9    objections, but by making reference at this time, I think it

10   will help frame some of the disputes in the case.

11        The 2012 version of the manual was used to determine

12   defendant's offense level under United States Sentencing

13   Guideline 1B1.11.  The guidelines for violation of 18, United

14   States Code, 1512(c)(2) is found in 2J1.2(a) of the manual.

15   The base offense level is 14.

16        The parties agreed at the time of the plea to

17   disagree as to whether eight levels would be added under

18   United States Sentencing Guideline 2J1.2(b)(1)(B) because the

19   offense involved a threat to cause physical injury to a person

20   in order to obstruct the administration of justice.  So I will

21   not impose that eight level at this time until after I hear

22   the objections.

23        There is also an objection as to whether two levels

24   will be added.  The challenged guideline is 2J1.2(b)(3)(C)

25   regarding whether the offense was extensive in scope,

1    planning, and preparation.

2            There is also a challenge to the obstruction of

3    justice, additional two points recommended in the presentence

4    report under 2C1.1.  It is charged that it is in the report

5    that defendant willfully obstructed or impeded or attempted to

6    obstruct or impede the administration of justice, and if

7    allowed, that would be a two-point addition.

8            So there is an eight-point challenge under

9    2J1.2(b)(1)(B).  There is a two-point challenge by the

10   defendant under 2J1.2(b)(3)(C).  There is a two-point

11   challenge under United States Sentencing Guideline 3C1.1.

12           And at this time I will hear from the defendant on

13   his challenges as outlined.  Whenever you're ready.  Go ahead.

14   We will take up the eight-level challenge first.

15           MR. BAKHTIARI:  Yes, Your Honor.  Your Honor, under

16   Section 2J1.2(b)(1)(B), the United States has asked for an

17   eight-level enhancement to the offense level based on two

18   underlying facts:  That on January 15, through an unknown

19   route, with some unknown means, an unknown person has sent an

20   email to Mr. Hiles threatening the well-being of his family;

21   and furthermore, throughout a civil discovery, a rifle has

22   been produced at his request to Mr. Hiles' colleagues.

23           The Government maintains that this establishes posing

24   physical threat to the well-being of these individuals in

25   order to obstruct justice.

1          The elements of this enhancement is essentially the

2    same as the indictment that was dismissed.  Earlier through

3    these proceedings the Government conceded that they could not

4    assert and fulfill the elements of 18, U.S.C., 1875 Section C,

5    which is communicating the threat via internet.  They

6    voluntarily withdrew that cause, and they dismissed that

7    indictment.

8          Now, Mr. Sauer is back with a request to reimpose

9    that cause through a different channel to obtain enhancement

10   on the guidelines.

11         Now, if I may, Your Honor, I cite United States v.

12   Farrow, a case from 1999, which calls this an "impermissible

13   double counting that is just simply reimposition of an issue

14   which has been decided earlier."

15         Now, as far as if these alleged factual conducts and

16   these -- if these alleged conducts have occurred or the

17   veracity of this allegation, we'll have to cross-examine a few

18   witnesses.  I have two witnesses that would speak to the

19   calculation of the guidelines specifically, including to this

20   plus-eight enhancement, Your Honor.

21         Now, I can proceed by cross-examining those witnesses

22   at this time or any time the Court is ready for that, having

23   noting that one of my witnesses is yet to arrive, and he is

24   actually practicing law in this court.  I think he's caught up

25   with some other hearings.  He'll be here about ten o'clock,

1   Your Honor.  But I have one witness speaking to this specific

2   issue at this time.

3            THE COURT:  Okay.  You understand you will not be

4   cross-examining him.  You will be presenting him as your

5   witness, and you will not be allowed to lead them.  Do you

6   understand?

7            MR. BAKHTIARI:  I will be -- well, the Government

8   will pose questions, and so will I.  Is that not allowed, Your

9   Honor?

10           THE COURT:  Well, if the United States calls them,

11  then they will direct them, and then you would cross-examine

12  them.

13           MR. BAKHTIARI:  Yes.

14           THE COURT:  Are you going to present any witnesses,

15  Mr. Sauer?

16           MR. SAUER:  I have certain witnesses available,

17  Judge.  I had planned and prepared to have Mr. Brad Hiles, who

18  is the principal in this case, testify, and it would be

19  helpful to the Court, as well as Mr. Fogarty, who is outside.

20           THE COURT:  All right.  Very well.

21           MR. BAKHTIARI:  Will I be able to proceed after

22  Mr. Sauer and pose questions to those witnesses, Your Honor?

23           THE COURT:  Yes.

24           MR. BAKHTIARI:  Thank you.  I have also two witnesses

25  directing -- speaking directly to this eight-level

1  enhancement.

2          THE COURT:  All right.

3          MR. BAKHTIARI:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          Mr. Sauer, are you ready, sir?

6          MR. SAUER:  I am, Your Honor.  And I guess maybe the

7  most sufficient use of the Court's time would be to proceed

8  directly with the testimony prior to argument on this because

9  I believe Mr. Hiles' testimony will directly address this

10  eight-level disputed enhancement.

11          THE COURT:  Very well.  Please come forward.  Raise

12  your right hand, sir.

13              **(WITNESS SWORN BY THE CLERK.)**

14          THE COURT:  You may inquire.

15                  **BRADLEY S. HILES,**

16  **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

17  **FOLLOWS:**

18                  **DIRECT EXAMINATION**

19  **BY MR. SAUER:**

20  Q    Could you please state your name, sir?

21  A    Bradley S. Hiles.

22  Q    What is your occupation?

23  A    I'm an attorney here in St. Louis.

24  Q    What firm are you employed with?

25  A    Husch Blackwell, LLP.

1    Q      How long have you been an attorney?

2    A      For 32 years.

3    Q      Are you familiar with a man called Alireza Bakhtiari, or

4    Al Bakt?

5    A      Yes, I am.

6    Q      And is that person present in the courtroom today?

7    A      He is.

8    Q      How do you know Mr. Bakhtiari?

9    A      I have defended one charge of discrimination and two

10   civil lawsuits filed by Mr. Bakhtiari against a couple of my

11   clients, Career Education Corporation and Missouri College.

12   Q      And very briefly, I don't want to get into any kind of

13   mini trial on the issues, can you summarize the nature of the

14   charges in those three matters and how they were disposed of?

15   A      Yes.  In 2009 Mr. Bakhtiari filed a charge of national

16   origin discrimination and retaliation.  He filed it with the

17   Missouri Commission on Human Rights.  And I represented those

18   two educational institutions that I just identified, and that

19   resulted in a settlement through mediation before the Missouri

20   Commission on Human Rights.  So it did not go to the civil

21   lawsuit stage.

22   Q      Is it fair to say that that was settled very early in the

23   proceedings?

24   A      It was.

25   Q      Did that settlement involve any kind of admission of

1  wrongdoing on the part of Missouri College or its affiliates?

2  A    No.  To the contrary, the settlement agreement contained

3  a strong nonadmissions clause.

4  Q    Was there subsequent litigation between Mr. Bakhtiari and

5  your clients?

6  A    Yes, there was.  In 2010 Mr. Bakhtiari filed what can

7  generically be described as a defamation lawsuit against

8  Missouri College and, I believe, its president, Carl Peterson,

9  and against a staff member.  I also defended that lawsuit.

10 Q    How was that lawsuit resolved?

11 A    That was also resolved through a settlement, again in

12 mediation, and it was a rather early mediation in the process.

13 The civil action was brought here in the U.S. District Court

14 for the Eastern District of Missouri.

15 Q    Was that mediation settlement -- that mediation

16 settlement, did it involve any admission of wrongdoing by your

17 client?

18 A    Similar to the discrimination charge, there was a

19 settlement agreement, and the settlement agreement contained a

20 strong nonadmissions clause.

21 Q    Without concealing any communications, potentially

22 privileged communications between yourself and your client, is

23 it fair to say that those two settlement decisions were made

24 for cost benefit or strategic purposes?

25 A    Absolutely for cost benefit purposes, yes.

17

1  Q     And specifically, the cost of litigating these matters

2  would have been significant?

3  A     They would have, yes.

4  Q     Was there a third lawsuit filed by Mr. Bakhtiari against

5  your clients?

6  A     There was.  In 2011 he filed another pro se defamation

7  lawsuit.  The allegations in that lawsuit were similar to the

8  allegations in the first lawsuit.  He brought it once again in

9  the U.S. District Court for the Eastern District of Missouri,

10  and again I defended Missouri College and its president, Carl

11  Peterson.

12  Q     Without getting into any communications, is it fair to

13  say that a decision was made to vigorously defend this

14  particular lawsuit?

15  A     Most certainly it was, yes.

16  Q     And was this lawsuit pending in front of Judge Limbaugh,

17  Jr.?

18  A     Yes.  It is pending before him, yes.

19  Q     Did you file a motion for expedited discovery in that

20  lawsuit?

21  A     I did.  It was a motion for expedited discovery, and it

22  was coupled with a motion for a protective order asking the

23  Court to grant defense counsel access to Mr. Bakhtiari's

24  electronic equipment and also asking the Court to issue an

25  order whereby he would not destroy or tamper with that

1    equipment before we had that access.

2    Q    What was the purpose of seeking to examine Mr.

3    Bakhtiari's electronic equipment?

4    A    The allegations on which his lawsuit were based involved

5    a letter on Missouri College letterhead that I believed had

6    been forged.  In fact, it was my belief that the letter had

7    been forged by Mr. Bakhtiari.

8    Q    If I may interrupt you there, did you prepare a lengthy

9    victim impact statement in this case?

10   A    I did.

11   Q    And has that been submitted to the Court as part of the

12   Government's sentencing filings?

13   A    I believe that it has.

14   Q    To the best of your knowledge, is everything you said in

15   that victim impact statement true and correct?

16   A    Yes, it is.

17         MR. SAUER:  Judge, I'd just like to incorporate by

18   reference Mr. Hiles' victim impact statement that goes into

19   more detail on these issues.  That's been filed as Exhibit B

20   to the Government's sentencing memorandum in this case.

21         THE COURT:  Very well.  Received.

22   Q    (BY MR. SAUER) So you had testified a moment ago that you

23   suspected that the letters on which the lawsuit were based,

24   the third Bakhtiari legal matter were based, were forged, and

25   you sought electronic inspection of his electronic equipment

1    in order to verify that suspicion; is that correct?

2    A    That's correct.

3    Q    Did Judge Limbaugh grant that order?

4    A    He did.

5    Q    Or that motion, I apologize.

6    A    Yes.  On December 30, 2011, he granted the motion.  And

7    in granting the motion, he directed Mr. Bakhtiari to produce

8    his electronic equipment within 14 days.

9    Q    So would that be by -- to produce it by January 14?

10   A    Actually maybe the 13th, but I may be off by a day or

11   two.  It was either the 13th or 14th, yes.

12   Q    Did Mr. Bakhtiari produce any electronic equipment for

13   discovery within the time allotted by Judge Limbaugh's order?

14   A    He did not.

15   Q    Did you take any action as a result of his failure to do

16   so?

17   A    Yes, I did.  On January 14 I filed a motion for sanctions

18   and for contempt with Judge Limbaugh informing the Court that

19   Mr. Bakhtiari had not complied with the Court's order and

20   produce the electronic equipment.

21   Q    And that was filed -- you say that was filed on January

22   14?

23   A    It was.  It was -- if I know I have the day right, the

24   day was Saturday afternoon, and I believe that was January 14,

25   yes.

1   Q    What sanctions did you seek against Mr. Bakhtiari at that

2   time?

3   A    I sought dismissal of his civil action, and I also sought

4   attorneys' fees.  As far as the contempt angle went, I left

5   that, as I should, to Judge Limbaugh.

6   Q    You say that was filed on Saturday, January 14, to the

7   best of your recollection?

8   A    Yes, sir.

9   Q    During this time period, had you had interactions

10  face-to-face with Mr. Bakhtiari?

11  A    Yes, I had.  Not that day, but for --

12  Q    In the course of three years of litigation, you met him

13  face-to-face.

14  A    Three years.  Yes, I did.

15  Q    Did he also have your phone number?

16  A    He did.

17  Q    Did he also have your work email address?

18  A    Yes, he did.

19  Q    Did you receive an email at your work email address late

20  in the evening of the following day, Sunday, January 15, 2012?

21  A    Yes, I did.

22  Q    And when did you actually become aware of that email or

23  open it?

24  A    I opened it the next morning, which would have been

25  Monday morning.

1   Q    Your Honor, may I approach the witness?

2          I'm handing you about six sheets of paper stapled

3   together that are collectively marked as Government's Exhibit

4   1.  Do you recognize those papers?

5   A    Actually, if I could get my reading glasses.  Thank you.

6   Yes, I recognize these papers.

7   Q    What are those papers?

8   A    This is an email message that I received.  It was

9   actually received in my office email outbox at 10:41 PM on

10  Sunday, January 15.  This is the email that I opened the

11  morning of Monday, January 16.

12  Q    And did that document -- is that a true and accurate

13  collection of that email and its attachments that you received

14  in the in-box on January 15 and opened in the morning of

15  January 16?

16  A    Yes, it is.

17         MR. SAUER:  Your Honor, I move for the admission for

18  the purpose of the sentencing hearing of Government's Exhibit

19  1.

20         THE COURT:  Received.

21         MR. SAUER:  May I retrieve?

22         THE COURT:  Yes.

23  Q    (BY MR. SAUER) What day of the week was January 16?

24  A    It was a Monday, and it was actually Martin Luther King's

25  day.

1    Q     So it was -- was it a federal holiday?

2    A     It was.

3    Q     And is that the day that you actually opened this email

4    in the morning hours?

5    A     Yes, sir.

6    Q     I don't want to go into any of the -- and I want to read

7    this language out loud, but when you received this email, did

8    you have a suspicion or belief as to who had sent it to you?

9    A     Yes, I did.

10   Q     Who did you believe that that was?

11   A     Alireza Bakhtiari.

12   Q     I just want to start at the top of this email.  Can

13   you -- is the email displayed on the screen in front of you?

14   A     It is.

15   Q     On the -- what's indicated in "from," the sender of the

16   email, what's indicated there?

17   A     Jamie and Eric Hiles.  And then an email address of

18   theyoung.hiles@gmail.com.

19   Q     Who are Jamie and Eric Hiles?

20   A     Eric Hiles is my son, and Jamie is his wife.  They were

21   married a few months before my receipt of this email.

22   Q     And directing your attention to the subject line, what

23   does it say there?

24   A     "Eric and Jamie sitting in a tree."

25   Q     And then directing your attention to the body of the

1   email, I don't want to read the language, but this word

2   "dearest" in the salutation line, "Bradley boy, my dearest,"

3   did that word strike you in any way?

4   A    It did.  And he also used the word "dear" in the text of

5   the message.  In my encounters with Mr. Bakhtiari, I had

6   experienced him using the word "dear" or some derivative of

7   the word "dear" when being condescending towards people.

8   Q    And then there is a word here that begins with "C" that I

9   won't say out loud.  Had you heard Mr. Bakhtiari use that

10  word?

11  A    Yes, I have.

12  Q    Frequently or on multiple occasions or just one time?

13  A    It was more than one time.

14          THE COURT:  Go ahead and put it in the record because

15  the Court of Appeals needs to know what the word is.

16  Q    I apologize, Your Honor.  Here in the first line it says,

17  "Since I've known you, you have been a good cunt."  The word

18  "cunt," is that a word that you had known Mr. Bakhtiari to

19  use?

20  A    Yes, it is.

21  Q    And is that word "cunt" repeated in the email?

22  A    Yes, it is.

23  Q    Then the word "dearest" and "dear," are those words that

24  you also knew him to use in a condescending fashion?

25  A    That's correct.

24

1   Q    I just want to direct your attention to the attachments

2   line.  Were there attachments to this email when you received

3   it?

4   A    Yes, there were.

5   Q    And were they also JPEG files or images?

6   A    Yes.

7   Q    Could you read the first three titles of the attachment?

8   A    The first three are:  Brad and Toni-1; Brad and Toni-2,

9   and Brad and Toni-3.

10  Q    Who is Toni?

11  A    Toni is my wife.

12  Q    And were you aware that he knew your wife's first name?

13  A    I was not aware of that.

14  Q    I'm going to direct your attention now to the next three

15  pages of this document.  Is it fair to say that these are all

16  photographs of a house?

17  A    Yes, they are.

18  Q    What house is that?

19  A    It's my house.

20  Q    And were those three photographs that are the next three

21  pages of this document, were those the JPEG images that were

22  titled "Brad and Toni-1"; "Brad and Toni-2"; and "Brad and

23  Toni-3"?

24  A    That's correct.

25  Q    I now want to direct your attention to the next two JPEG

1    images attached to the file.  Could you read the title of

2    those?

3    A    "EJH-11" and "EJH-21."

4    Q    What did you believe EJH to stand for when you opened

5    this email?

6    A    I believe it was a reference to my son, Eric, and my

7    daughter, Jamie, the last initials being Hiles.

8    Q    So you thought that stood for Eric and Jamie Hiles?

9    A    Yes.  And if I said daughter Jamie, I meant

10   daughter-in-law.

11   Q    And then directing your attention to the next two pages

12   of the exhibit, is that -- is this what was portrayed when you

13   opened the JPEG image EJH-11?

14   A    Yes, it is.

15   Q    Had you seen that photograph before?

16   A    Well, certainly not with a rifle scope cross hair on it,

17   but that is a photograph of my daughter-in-law, Jamie, taken

18   at her wedding.

19   Q    And then the next page of this, can you describe what's

20   in that picture?

21   A    That is another wedding photograph, this time with Jamie

22   and my son Eric.  Obviously, I had never seen it with a rifle

23   scope cross hairs superimposed on my son's head.

24   Q    And is that what was under EJH-21?

25   A    Yes, it is.

1    Q    Then was there one more JPEG image attached to this

2    email?

3    A    Yes.  It is simply entitled "Emily.jpg."

4    Q    Then what was portrayed when you opened that one?

5    A    It's a picture of a girl.  I do have a daughter named

6    "Emily."  That is not a picture of my daughter, Emily.

7    Q    Did you Google your daughter's name, "Emily Hiles"?

8    A    I did.  Later that day, trying to figure out what that

9    picture might have been, I Googled "Emily Hiles," and I found

10   that very image on a screen that had several other images.

11   That screen contained images of the Emily Hiles who is my

12   daughter.

13   Q    Were you aware that Mr. Bakhtiari knew your daughter's

14   name?

15   A    I was not aware that he knew her name, no.

16   Q    How did you react emotionally to the receipt of this

17   email when you first opened it in the morning of January 16 of

18   2012?

19   A    I was shocked.  I was horrified.  And I just kept it to

20   myself and tried to ponder the situation and the gravity of it

21   for a while, probably thirty minutes, but maybe an hour.

22   Q    Did you believe that it was a threat of violence against

23   members of your family?

24   A    I absolutely did.

25   Q    Did you believe that there was an implied threat in the

1   portrayal of your own house in that email?

2   A    Yes, I did.

3   Q    What threat did you perceive there?

4   A    Well, it told me that Mr. Bakhtiari knew where I lived

5   and that he had quite possibly taken photographs of my house

6   to send them to me as part of this threat, of windows in the

7   front of the house or windows that we walk by and sit by, in

8   one case sleep near.

9   Q    What about the rifle cross-hair graphics on the face of

10  Brad -- of Eric and Jamie, how did you react to those?

11  A    That was the most horrifying part of it.  We had just

12  been to their wedding, obviously, in Tampa, Florida.  I had

13  been the best man in the wedding.  A time that should have

14  been, and was at that time, a very happy moment of celebration

15  had been used against me to threaten me, to scare me, and to

16  scare my son and daughter-in-law.

17  Q    Did you convey information about this threat to members

18  of your family?

19  A    Yes, I did.  After or within about an hour, I spoke to my

20  wife, Toni.  I had an initial reluctance to talk to her about

21  it because of the graphic and horrifying nature of the

22  pictures of Eric and Jamie, but I did share it with her, and

23  she was devastated by it.  She cried.

24          And so we spent some time talking through it, and she

25  had some questions for me, obviously, about Mr. Bakhtiari and

1  his character and his nature.  So yeah, I started with talking

2  to Toni.  I'm sorry.

3  Q    Did you go on to convey information about this threat to

4  your children?

5  A    I did.  I called Eric and Jamie, who were actually at

6  home that day.  They were not working as well.  And I did not

7  forward the message to them, but I did read the text of the

8  message.  I told them about the photographs, and I told them

9  about the graphic photographs of them with the cross hairs.

10  Q    And what was their reaction to this information?

11  A    They were scared.  They were -- there was a certain

12  amount of stunned silence to it, I have to tell you.  They are

13  smart kids.  They are both attorneys.  Jamie had been a

14  state's prosecutor up until about six months before this

15  event, and then they had moved to DC, but as a prosecutor

16  she -- I mean, she encounters issues like this, and she, in

17  particular, took it very, very seriously.

18  Q    Did you also convey information about this threat to

19  Emily?

20  A    I did.  Later, not on the same call, but later that day I

21  called Emily as well.

22  Q    And was she also -- did she also express fear and alarm

23  about the incident?

24  A    Very much so.  In fact, she cried about it and was so

25  distraught that we actually had to reconvene that call a

1    little bit later.

2    Q      Did you discuss this issue with any colleagues at Husch

3    Blackwell on the same day?

4    A      I did.  I called my partner, Glennon Fogarty, from home,

5    and he agreed to meet me in the office.  I think Glennon was

6    taking the day off as well.  And so at my office I opened the

7    message on my computer screen, and Glennon read it and saw the

8    images.

9    Q      Did you and Glennon, acting together, make any attempt to

10   contact law enforcement regarding this threat?

11   A      Yes, we did.  We called the U.S. Attorney's office, your

12   office, not you, but one of your colleagues, Jim Crowe.

13   Q      And did you make him aware of the threat?

14   A      Yes, we did.

15   Q      And were you aware that a federal investigation was

16   commenced almost immediately, beginning the next morning?

17   A      Yes, I was aware of that.

18   Q      Did you remain in sort of cooperation or communication

19   with Mr. Follmer in the course of this investigation?

20   A      I did.

21   Q      Have you and your family continued to experience fear and

22   anxiety about this threat?

23   A      Yes, we have.

24   Q      Go ahead.  Could you summarize that for us?

25   A      Well, I mean, we have taken some measures at our home,

1  Toni and I have.  Our children have taken some measures.  But

2  despite those, we were always fearful of that knock at the

3  door or some crash or some visit or some tail by Mr.

4  Bakhtiari.

5  Q    Did you contact local police in any attempt to beef up

6  security in your home?

7  A    I contacted a police official to talk through the

8  possibilities.  What I ultimately concluded from that was,

9  there's no way to get around-the-clock protection, especially

10 protection for a bullet crashing through a window.  But yes, I

11 did.

12 Q    Is your house in a crowded area, or is it a relatively

13 isolated area?

14 A    It is very isolated.

15 Q    And has that had any effect on your -- you and your

16 wife's anxiety regarding this incident?

17 A    It's caused even greater concern because it's accessible

18 through that isolation.

19 Q    Have you all taken any personal security precautions, for

20 example, when people come to your door?

21 A    Absolutely.  We have a routine at our house now whenever

22 there's a knock at the door or the doorbell rings, and

23 frankly, I'd rather not describe that routine.

24 Q    Without any further details, you have a routine to take

25 precautions whenever anyone comes to the door?

1    A    Yes.

2    Q    Have your children continued to experience alarm,

3    anxiety, fear about this incident?

4    A    Very much so.  I have a daughter, and I'd rather not say

5    where she lives, but she is somewhat local in the St. Louis

6    metropolitan area.  I did take some steps to determine the

7    make and color of Mr. Bakhtiari's car so that I can inform our

8    children.  And this daughter who lives in the St. Louis metro

9    area has called me to tell me that she felt like she was -- or

10   she believed she was being tailed by a car of that

11   description.

12   Q    Did you also share photographs of Mr. Bakhtiari with your

13   wife and your children?

14   A    Yes, I did.  I obtained a few photographs from the

15   internet and forwarded those to my kids and printed them out

16   for Toni.

17   Q    What was the purpose of that?

18   A    So they would know what he looks like in case he

19   approached them.

20   Q    Did you ever receive any kind of apology from Mr.

21   Bakhtiari for sending the email?

22   A    Not once.

23   Q    Is Mr. Bakhtiari's civil lawsuit still pending against

24   your client?

25   A    It is.

1    Q    Do you have any views as a victim in this case as to

2    whether or not Mr. Bakhtiari should be sentenced to a term of

3    imprisonment?

4    A    I do.

5    Q    What are those views?

6    A    Your Honor, I would ask that you sentence him to the

7    maximum term that's been requested by the U.S. Attorney.  I

8    obviously haven't seen the presentence reports, so I don't

9    know what's in there, but my family and I are scared.  I would

10   ask that he be put in a prison for many years and that during

11   that time he be denied access to the internet, and upon his

12   release, which I would hope would be a supervised release at

13   least for a period of time, that he not be allowed to utilize

14   the internet at that time either.

15   Q    I forgot to ask you.  Did you become aware of an incident

16   involving the actual display of a loaded rifle to your

17   colleague, Mr. Fogarty?

18   A    I most certainly did.

19   Q    When did that occur?

20   A    That occurred on -- well, Monday was the day that I

21   opened the email.  It was either the next day or the following

22   day.  I believe it might have been the -- yes, it was the

23   following day, so it would have been Wednesday.

24   Q    And we're going to hear from Mr. Fogarty about that, but

25   can you just describe what the effect that that incident had

1   on the anxiety of you and your family?

2           THE COURT:  Okay.  Wait a minute.  I thought you got

3   the email on Sunday and looked at it on Monday.

4           THE WITNESS:  That's correct, Your Honor.

5           THE COURT:  So it would be Tuesday the --

6           THE WITNESS:  No.  I believe it was actually

7   Wednesday when Glennon Fogarty was at Mr. Bakhtiari's house.

8           THE COURT:  Okay.

9   Q    Can you just describe what effect that incident had on

10  your -- the anxiety of you and your family?

11  A    Yeah.  It heightened it because it not only confirmed

12  that he had sent the email, it was a very clear signal that he

13  wanted me to know he had sent the email, and furthermore, that

14  he had a gun with a scope and cross hairs and he knew how to

15  use it.

16          MR. SAUER:  That's all the questions I have, Your

17  Honor.

18          THE COURT:  Okay.  Just a second.  I want to catch up

19  here.  Again state the identity of Glenn Fogarty.

20          THE WITNESS:  It's Glennon.  G-L-E-N-N-O-N Fogarty,

21  F-O-G-A-R-T-Y.  And he's my law partner.

22          THE COURT:  Thank you.  You may inquire.

23          MR. BAKHTIARI:  Thank you, Your Honor.

24                          **CROSS-EXAMINATION**

25  **BY MR. BAKHTIARI:**

1   Q    Good morning, Mr. Hiles.  Given the fact that this pains

2   me severe on your family, I'm going to make this quick.  Mr.

3   Hiles, are you aware that the indicted count, 18 U.S.C.

4   875(C), which had you as the victim, that count has been

5   dismissed?  Are you aware of that?

6          MR. SAUER:  Objection.  Beyond the scope of the

7   witness' personal knowledge.

8          THE COURT:  Well, I'm not sure yet.  Overruled.  If

9   you know.  Don't guess or speculate.

10  A    I don't know if it's been dismissed.

11  Q    Do you know if you're currently an active victim before

12  these proceedings in this court?

13  A    I most certainly do know that.  Yes, I am a victim.

14         MR. BAKHTIARI:  Thank you.

15         Your Honor, I have a few exhibits that has been

16  produced to Mr. Sauer as initial disclosures.  Now, I have

17  copies for you, the witness, and Mr. Sauer.

18         THE COURT:  All right.

19         MR. BAKHTIARI:  May I hand these out and question

20  about them?

21         THE COURT:  If you would give them to the clerk,

22  she'll hand them up.

23         MR. BAKHTIARI:  Yes, Your Honor.  One for the

24  witness, one for the honorable judge, if I may, and this is

25  your copy, sir.

1    THE COURT:  For the record, this appears to be a

2 docket sheet in this case.

3 Q    (BY MR. BAKHTIARI) Sorry for the delay.  Mr. Hiles, have

4 you seen this docket?

5 A    I don't know that I've seen this version of the docket.

6    And, Your Honor, if I may just for the record, this

7 appears to be the docket in a civil action pending before

8 Judge Limbaugh.

9    THE COURT:  Okay.

10 A    Not the docket in your criminal case.

11    THE COURT:  Oh, I see.  Yes.  Thank you.  That's

12 correct.

13 Q    May I ask you to read for the Court the attorneys who

14 have entered their appearance on behalf of the defendants in

15 that case?

16 A    Myself, Glennon Fogarty, and Anthony Grice.

17 Q    And are there other attorneys involved representing other

18 parties who are defendants?

19 A    I do not see them listed on the first sheet of this case.

20 Q    Do you know if there were other defendants in this suit

21 involved?

22 A    There was.

23 Q    Who was that defendant?

24 A    The staff member at Missouri College.  Her name is

25 escaping me now.

1  Q      Could that be, by any chance, Ms. Patricia Leader?

2  A      Patricia Leader Frank.  And she was represented by Frank

3  Vatterott.

4  Q      Would that be fair to say that Attorney Vatterott and

5  Attorney Paul Devine represented that defendant?

6  A      That's correct.

7  Q      Did -- throughout those proceedings, did Attorney Paul

8  Devine file several dismissal motions and dismiss almost half

9  of the plaintiff's counts in that suit?

10         THE COURT:  Okay.  Now, this is what I don't want to

11  get into, is retrying some kind of a civil case.  How is that

12  possibly relevant to this matter?

13         MR. BAKHTIARI:  Yes, Your Honor.  Because another

14  attorney was doing a lot of heavy lifting and had succeeded in

15  dismissing the main defendant has not been threatened.

16         Now, the allegation is a simple allegation -- a

17  simple motion for sanction has become a motive to threaten and

18  horrify an innocent family.

19         THE COURT:  But how is it relevant to what happened

20  in the civil case?  How is that relevant?

21         MR. BAKHTIARI:  Well, it's just a matter of

22  establishing the motive, because the attorney for Government

23  alleged that a sanction motion was the motive, and another

24  attorney, who is Attorney Paul Devine, who did most of the

25  heavy lifting in that civil suit, he did not receive any

1    threat.

2            THE COURT:  Okay.  So your plan is to say that this

3    other attorney is the one who threatened him and not you?

4            MR. BAKHTIARI:  No.  My plan is to say there is no

5    motive here.  The motive is not -- is absolutely inconsistent

6    with what's happened in that civil suit and what the docket

7    reflects.

8            THE COURT:  Well, it seems so tangential.  I'll allow

9    you one more question, and then let's move on to something

10   else.

11   Q   (BY MR. BAKHTIARI) Yes, Your Honor.

12           About this specific docket, Mr. Hiles, is this the

13   second lawsuit which was filed in 2010?

14   A   It was the first lawsuit.  It was your second civil

15   action against Missouri College and Career Education

16   Corporation.

17   Q   Did you -- did your law firm approach me and propose a

18   global settlement for this suit?

19   A   I don't know what my law firm did.  I engaged in

20   settlement negotiations.  I would not call it a global

21   settlement because I wasn't speaking on behalf of all of the

22   defendants, but, yes, I agreed to participate in the court's

23   early mediation program, and we met before a mediator, and I

24   was the chief negotiator in that mediation.

25   Q   Would that be fair to say that you proposed settlement

1    and you encouraged that?

2    A    I don't know if that's fair to say or not.  The mediator

3    participated, I participated, and you participated.  There

4    were settlement offers and counteroffers that were made

5    throughout the day.  Sitting here right now, I don't remember

6    who made the first offer.

7    Q    Did you suggest your old friend, Richard Sher, to act as

8    the mediator?

9                MR. SAUER:  I object to the relevance.

10               THE COURT:  Yeah.  This is irrelevant.  I'm not going

11   to -- I told you, I'm not going to retry those lawsuits.

12               MR. BAKHTIARI:  Yes, Your Honor.

13               THE COURT:  Sustained.

14   Q    (BY MR. BAKHTIARI) If I may, I will move on from that

15   point.  Well, you already touched on these issues.  Did we

16   settle the first set of civil suits in April of 2009?

17               MR. SAUER:  Same objection, Your Honor.

18               THE COURT:  Well, overruled.  Let me hear it, but

19   again, I don't want to try those lawsuits.

20               MR. BAKHTIARI:  Yes, Your Honor.

21               THE COURT:  One question.

22   A    We did not settle a first round of civil lawsuits in

23   April of 2009.  We did sometime in 2009, possibly in April,

24   settle a charge of discrimination and retaliation pending

25   before the Missouri Commission on Human Rights.

1    Q    Did I correspond with the general counsel of Missouri

2    College back in 2009, Mr. Jeff Ayers?

3    A    I don't know whether you did or not.

4    Q    Do you recall that I met with general -- one of the

5    general counsel members of college in that mediation, Ms.

6    Laura Fisher?

7              MR. SAUER:  Objection to the relevance.

8              THE COURT:  Yeah.  You know, we're going to stop.

9    You tell me how this could possibly be relevant to anything

10   today.

11             MR. BAKHTIARI:  Your Honor, the individuals who have

12   the critical say about discovery or settlement in those civil

13   suits are the members of this general counsel of college and

14   also the president of the college, Mr. Carl Peterson.  These

15   are the people who have the key say.  None of them have

16   received a threat.  An attorney who had somewhat of a minor

17   role claims to have received the threat from me to influence a

18   civil suit; that these line of questioning is addressing

19   simply the motive and the whole intent premise.  Honorable

20   Limbaugh has the final say on discovery and settlement

21   matters.  He never received a threat.

22             THE COURT:  Well, you know --

23             MR. BAKHTIARI:  I never --

24             THE COURT:  -- there could be a thousand people who

25   didn't receive threats.  We're talking about who did receive

 1    threats.  It's irrelevant.

 2              MR. BAKHTIARI:  That's right, Your Honor.  Your

 3    Honor, I have Hiles Exhibit 2, if I may.

 4              THE COURT:  All right.  Thank you.

 5    Q    (BY MR. BAKHTIARI) Mr. Hiles, may I ask you to look at

 6    those sets of email correspondence?  Do you recognize the

 7    first email, the first page?

 8    A    I don't understand your question.

 9    Q    Do you recognize the first email, the first sheet

10    basically on that exhibit?

11    A    I don't remember reading this.  I'm sure that I did.  It

12    was a carbon copy of this email was sent to me.  I see it now.

13    What's your question?

14    Q    May I ask you to go to the second page?  The content of

15    the emails starts with, "Don't bother, Dick."  May I ask you

16    to read -- it's a one-line email.  May I ask you to read that

17    aloud for the record?

18    A    "Don't bother, Dick.  I won't dignify plaintiff's

19    insulting messages by further responding to him or by wasting

20    your time."

21    Q    Are you the signatory to the email?

22    A    Yes.

23    Q    Does the email say that down the road or prior to that, I

24    had insulted you in some correspondences?  If you'll flip

25    through the other pages, if you want.

1   A    Yeah.  I will be glad to do that.

2   Q    May I help out here by pointing to where I'm addressing?

3   A    I would appreciate it if you would give me an opportunity

4   to read these multiple emails before I answer any questions.

5   Q    Yes.  Please.

6   A    I reviewed the emails.

7   Q    Now, on the second page it appears to be an email from me

8   to a number of people, including you.  The part that says:

9   "Dear, Dick, I may have been -- it may have been that your old

10  friend and colleague had been an admirable just -- jurist

11  sometimes in the past, but at this time we are all concerned

12  with resolving or alternatively process -- proceeding with

13  discovery in this case.  Let the old stories of has-beens and

14  bygones be gone.  Brad is obsessively pursuing something which

15  he does not utter in the case, which is admittedly settled."

16        And then I proceeded by saying, "One may just

17  speculate if it is these geriatric signs of senility, which

18  include our progress in this final wrap-up."

19        Do you recall that in the first page email you

20  objected to the language and the offensive nature of what I

21  had written to you?

22  A    I didn't object to it.  What I told Mediator Dick Sher

23  was that I was not going to dignify your insults by a

24  response.  The insults consisted of you calling me a

25  "geriatric senile old jurist," calling me "obsessive," and it

1    followed some emails in which you sent ex parte messages --

2    well, not ex parte, but you sent messages directly to my

3    client, Laura Fisher, after I had asked you not to communicate

4    directly with my client because I was the counsel of record in

5    the case.

6    Q    That --

7    A    So it was a series of insults that were in this string

8    and improper communications that were in the string, and I was

9    simply telling Dick Sher:  I'm not going to respond to

10   insults.

11   Q    May I impose my question at this time about that?  Even

12   though they were insulting, were they sent to you directly, or

13   were they sent from an anonymous email?

14   A    They were sent to me by Al_Bakt@hotmail.com just as

15   directly as your threatening email was sent to me the night

16   before Martin Luther King's day.  They both arrived in my

17   in-box.

18   Q    That is correct.  Now, the matters of that alleged email

19   aside, about the emails that are in that Exhibit No. 2 in

20   front of you, the insults and aggressive language, they were

21   sent to you in a matter of face-to-face rather than from an

22   anonymous email; is that fair to say?

23            MR. SAUER:  I object to this question as being asked

24   and answered, as being irrelevant, and I object to any further

25   questions in this line of correspondence.

1          THE COURT:  Well, here's the problem.  You know,

2     you're just digging a deeper hole for yourself.  I mean, this

3     shows animosity between you and him before this ever happened.

4     How -- it's just exactly the kind of thing as to why you need

5     a lawyer.  Those kind of things would never come up if you had

6     a lawyer.  You're hurting yourself.

7          MR. BAKHTIARI:  If I may, Your Honor, at times when

8     there were an animosity, it has been exhibit to Mr. Hiles in

9     his face directly.  And the history shows that at the time of

10    conflict, we have gone face-to-face rather than from a back

11    alley from an anonymous email.

12         But if I may, I will move on from that exhibit for

13    the benefit of time.  Exhibit No. 3, if I may.

14         THE COURT:  All right.

15    Q   (BY MR. BAKHTIARI) Thank you.  Here is your copy.  Mr.

16    Hiles, may I ask you to -- that is also a string of emails

17    that have been exchanged.  A couple of pages -- actually one

18    page down the road is an email which purportedly has been sent

19    from you.  Starts with "Al Bakt."

20         "Mr. Bakt, Arbitrator Sher has informed me that you

21    contacted him."  And then the rest.

22         And the second paragraph, do you recall that you

23    objected by saying:  "While it may boost your ego, you will

24    not foster a spirit of cooperation with me by questioning my

25    ability to decipher my own words, insulting my knowledge of

1   metadata, or insulting me on the duty to preserve evidence in

2   its original format"?  Do you recall that email?

3   A    I do.

4   Q    So do you recall that, even though an insult, as

5   inappropriate that it could be, but it was at least said to

6   you directly rather than from an anonymous email?

7   A    I'm not sure there's a question in there, but I did

8   consider your email to me, which you have not attached to this

9   string, to be insulting and condescending.

10  Q    That is correct.  And you admit on the record that even

11  though it was an insult, it was said to you directly?

12         MR. SAUER:  I object.  Asked and answered,

13  irrelevant, and I object to further line of questions on this

14  exhibit.

15         THE COURT:  Well, I will overrule.  You may answer

16  the question, and then we will move on.  Do you understand?

17  His question is, do you understand this one was sent directly

18  and not anonymously?

19  A    I believe that Mr. Bakhtiari sent both of them directly,

20  so it's difficult for me to answer that, but I will

21  acknowledge that this particular email was sent from his

22  account, Al_Bakt@hotmail.com.

23         THE COURT:  All right.

24  Q    Was this an anonymous email to you?

25         THE COURT:  He's -- okay.  Go ahead.  Answer the

1    question.  If you can, answer the question.

2    A    Your email to me that you have not produced in here that

3    led to my response of March -- well, I don't even know the

4    date of my response because you've conveniently deleted that

5    as well, but whatever date I responded in likely March of

6    2011, I believe that was sent by you.  Yes.

7    Q    And not from an anonymous email somewhere?

8    A    Mr. Bakhtiari, I don't know if you sent it from an

9    anonymous email or not because I don't have it here, you know.

10   Q    Thank you.

11   A    You didn't put it in here.

12   Q    If I may, Your Honor, I will move on to the next, Exhibit

13   No. 4.

14          MR. SAUER:  Judge, I would just like to say for the

15   record that Mr. Bakhtiari represented to you at the beginning

16   of this line of cross-examination that I had received all of

17   these.  I have not.  I am seeing them for the first time, so I

18   will be objecting on the grounds of discovery violations using

19   these exhibits.

20          MR. BAKHTIARI:  Well, Your Honor, the Government

21   received a large package of initial disclosures.  When I was

22   granted leave to proceed as a pro se cocounsel and with a

23   letter on top of that disclosure, Mr. Sauer was informed that

24   potentially all those contents would be used in the pretrial,

25   trial, or post-trial hearing and those proceedings.  Now it is

1  awfully convenient to say "I don't have these."

2       THE COURT:  Okay.  You're saying you have already

3  sent him this?

4       MR. BAKHTIARI:  Yes, Your Honor.  There's nothing in

5  these that Mr. Sauer has not seen before.

6       THE COURT:  Very well.  Proceed.

7  Q   (BY MR. BAKHTIARI) Mr. Hiles, my only question about that

8  is the first line.  Do you recall seeing that line from the

9  mediator or arbitrator in that case?

10      THE COURT:  What are you saying the first line?  I

11 mean --

12 Q   It says, "Al, I received your voice mail, and I do not

13 think there is anything inappropriate with you asking for a

14 deadline for completion of the settlement."  Do you recall

15 seeing that line?

16 A   I don't remember one way or the other.

17 Q   About that suit back in 2010, do you recall if we finally

18 settled it and moved on?

19 A   We finally settled it, yes.

20 Q   Did I get my check?

21 A   We did not move on.  You sued again.

22 Q   That's right.  In 2010 did I get my check after these

23 correspondences?

24      THE COURT:  That's irrelevant.  That's irrelevant

25 whether you got your check or not.  I don't want to try these

1    cases again.

2              MR. BAKHTIARI:  Yes, Your Honor.

3              THE COURT:  I don't know how to make it any clearer

4    to you:  Not trying these cases.

5              MR. BAKHTIARI:  Yes, Your Honor.

6              THE COURT:  Now, go ahead.  Get on with what's

7    relevant here today, please.  Nothing you've shown has any

8    relevance whatsoever to these issues as to whether or not

9    you've made threats to this witness.

10   Q    (BY MR. BAKHTIARI) Yes, Your Honor.  I apologize again.

11             The last question on that issue, if I may, did I use

12   any threats or violence to accomplish a settlement back in

13   2010?

14   A    You made statements that I considered threatening to my

15   clients but none that I considered threatening to me.

16   Q    Did you ever have to call the police or the federal

17   officers for help back in 2010 or '11?

18   A    I did not.

19   Q    Is that fair to say that correspondence and due process

20   accomplished what I wanted to accomplish?

21             MR. SAUER:  Objection.  Calls for speculation into

22   the mind --

23             THE COURT:  Yeah, sustained.  Move on to something

24   else that's relevant.

25             MR. BAKHTIARI:  Yes, Your Honor.  If I may, Exhibit

1    5, if I may.  Thank you.

2              THE COURT:  Again, is this something -- before we

3    even start this, this is something from one of those other

4    cases?  We are not going to try those other cases.

5              MR. BAKHTIARI:  No, Your Honor.  We are not trying,

6    definitely.  The counts that I have pleaded guilty to is

7    attempting to obstruct a civil suit.  That is the docket of

8    that civil suit.

9              THE COURT:  Well, but how is it relevant to this,

10   sir?  That's going to be dismissed in this case today.  That

11   has been agreed to be dismissed.

12             MR. BAKHTIARI:  That's Count 1.

13             THE COURT:  Uh-huh.

14             MR. BAKHTIARI:  The Count 2 that I have pleaded

15   guilty to is attempting to obstruct a judicial proceeding

16   which is ongoing, which is this civil suit.  And I would

17   assume that is relevant because that is the core of the count

18   that I have pleaded guilty to, which is obstruction of justice

19   and attempting to obstruct a civil suit.

20             THE COURT:  Wait a minute.  Let me see here.  On

21   paragraph 28:  The defendant willfully obstructed or impeded

22   or attempted to obstruct or impede the administration of

23   justice with respect to the investigation, prosecution, or

24   sentencing of the instant offense of conviction, and the

25   obstructive conduct related to the defendant's offense of

49

1    conviction and any relevant conduct or a closely related

2    offense.  Therefore, two levels are added.

3           Now, tell me, before we get into this, how you

4    believe going into this civil case will have any bearing on

5    obstruction of justice.

6           MR. BAKHTIARI:  Your Honor, we are actually on the

7    eight-level enhancement at this time.  And in conjunction with

8    pleading guilty to 18 U.S.C. 1512, the Government has

9    requested for an eight-level enhancement for using threat in

10   conjunction with some other conduct to obstruct justice.

11          Now, the obstruction of justice is centered on this

12   civil suit, and the allegation is that I have used violent

13   threat to hinder this civil suit, which is the content of this

14   exhibit which is before you right now, Your Honor.

15          THE COURT:  Mr. Sauer.

16          MR. SAUER:  If I may, Your Honor, I believe there are

17   two kinds of obstruction of justice.  There is the obstruction

18   of justice which he's pled guilty to, which is sending a

19   threatening email in an attempt to derail or affect

20   proceedings in this suit, and then there's the subsequent

21   obstruction of justice for actions he's taken since his

22   indictment and since his plea agreement.

23          This civil docket, which the Court can easily take

24   judicial notice of as I see, is the civil docket in the civil

25   case which he has -- which he's pled guilty to attempting to

1   obstruct justice.  And I believe the tenor of the questioning

2   on the basis of this document would be Mr. Bakhtiari's attempt

3   to argue that he did not, in fact, send the email and attempt

4   to influence these proceedings.

5          And my objection to that is different than relevance.

6   It's that he's admitted under oath in the plea agreement that

7   he did cause that email to be sent in an attempt to influence

8   those proceedings.  So I don't know how this is relevant to

9   the enhancements that are at issue here.

10          It seems to be relevant to -- it seems to be

11   relevant, if anything, to my claim that he is not entitled to

12   acceptance of responsibility because he's claiming that what

13   he said under oath in August, when we did the plea proceeding,

14   wasn't in fact true.

15          THE COURT:  Okay.  Well, let's see where it goes.  Go

16   ahead.

17          MR. BAKHTIARI:  Just a matter of clarification, Your

18   Honor.  One of the evils in this is that Mr. Sauer rushed

19   through drafting his plea agreement and he's called --

20   defendant caused the email to be sent.  That is very vague.

21   It doesn't specify any conduct.  And now, at the time of

22   calculation of the guidelines and also going through the

23   sentencing factors, Mr. Sauer is attempting to broaden the

24   range of what "causing be sent" encompasses.

25          Now, those words that I pleaded guilty to, they mean

1  specific things.  I've never in that document pleaded and

2  accepted to sending or causing or authoring the email.

3  Somehow contributing to it as a minor contributor, that's what

4  the document reflects, and that is what the sentencing should

5  be centered on.

6          Now, if I may, I will proceed with this with just a

7  couple of questions on the civil suit, and then we can just

8  completely move on from it.

9          THE COURT:  How can this witness shed any light on

10 that?

11         MR. BAKHTIARI:  Well, this witness is on the stand to

12 speak to the eight-level enhancement as far as use of violent

13 threats.  And Mr. Sauer in his objection kind of oozed into

14 the plus-two and plus-three enhancements that, you know, they

15 are yet to come up.  We are not addressing those right now.

16         THE COURT:  I know.  But how is this witness going to

17 give any testimony that's relevant to any of these issues?

18         MR. BAKHTIARI:  Well, this witness is the primary

19 witness who is going to be providing facts to the Government

20 for their allegation that would support the eight-level

21 enhancement.  I would believe that's why they have put Mr.

22 Hiles up here.

23         THE COURT:  Well, I quite honestly don't understand,

24 but just because that may be a flaw on my part, I'm going to

25 let you go ahead and ask the question.

52

1    Q    (BY MR. BAKHTIARI) Thank you, Your Honor.

2              Mr. Hiles, on that docket which is in front of you,

3    the civil suit in question, may I ask you to take a look at --

4    I will continue in a moment.  Let me find it.  May I ask you

5    to look at Docket No. 17?

6    A    Yes.

7    Q    Is that a memorandum for motion to dismiss by Mr. Devine?

8    A    It is.

9    Q    Did Mr. Devine dismiss his counts?  Was that granted,

10   that motion?

11   A    Mr. Devine did not dismiss it, but my recollection is

12   that Judge Limbaugh dismissed the count against Patricia

13   Leader Frank at about the same time he dismissed the count

14   against Carl Peterson, which was filed pursuant to my motion.

15   Q    That is correct.  Did Mr. Devine receive any threats, to

16   your knowledge?

17   A    I don't know if he received any threats from you or not.

18   Q    Great.  Now, may I ask you to move on to -- move on to --

19   may I ask you to move on to Docket No. 41?

20   A    Yes.

21   Q    Is that your expedited civil discovery motion?

22   A    I believe that it is, yes.

23   Q    And you filed that?

24   A    I did.  I believe I filed every pleading on behalf of the

25   defendant group, Missouri College and Carl Peterson.  I was

1   lead counsel for that group.

2   Q    Did you -- did that motion have numerous exhibits to it?

3         MR. SAUER:  Object to the relevance.

4         THE COURT:  Yeah.  I don't know why, but, okay,

5   overruled.  I will hear the question -- hear the answer.

6   Overruled.

7   A    Actually, the memo in support of that motion had a

8   variety of exhibits, yes.

9   Q    It was voluminous?

10  A    I don't know how voluminous it was.  According to

11  Pleading No. 43, it contained Exhibits 1 through 15.

12  Q    Now, right after that motion, did you receive any

13  threats?

14  A    Not right after that motion, no.

15  Q    Thank you.  May I ask you to go up --

16        THE COURT:  Okay.  That's enough.  That's enough.

17  Move on.  No more of this.

18        MR. BAKHTIARI:  Yes, Your Honor.  Sure.  Moving on to

19  the other exhibit.

20        THE COURT:  Wait a minute.  What's the other exhibit?

21        MR. BAKHTIARI:  The other exhibit, Your Honor, is

22  three other suits that I had filed in this court that lasted

23  about five years of litigation, and none of those attorneys

24  received any threats.

25        THE COURT:  All right.  I'm going to -- can I just

1    take notice that in the other five cases you haven't received

2    any threats?

3            MR. BAKHTIARI:  It was not this gentleman.  We

4    litigated against University of Missouri, a heavy litigation,

5    for about five years.

6            THE COURT:  The objection is sustained.  That has no

7    relevance to this case.

8            MR. BAKHTIARI:  Yes, Your Honor.  May I have that

9    back?  You can hold onto it.  Okay.  Exhibit 8.

10           THE COURT:  What's this?

11           MR. BAKHTIARI:  This is a motion -- this is a motion

12   for sanction before -- in this district court that was filed

13   by an opposing counsel.  I responded to without posing any

14   threats to any individual.

15           THE COURT:  See, you know, I don't care.  I don't

16   care.  I don't care if you have not threatened anybody else.

17   I don't care.

18           MR. BAKHTIARI:  Yes, Your Honor.

19           THE COURT:  I'm not going to hear this.

20           MR. BAKHTIARI:  Yes, Your Honor.

21           THE COURT:  The issue is whether you've threatened

22   this witness, not whether you threatened somebody else, didn't

23   threaten somebody else.  Has nothing to do with what's going

24   on here.

25           MR. BAKHTIARI:  Yes, Your Honor.

```
1            THE COURT:  It's like what I tried to get across to
2    you when we started.  I've seen so many people like you that
3    come in here and fashion some kind of a case that's totally
4    irrelevant, and you end up hurting yourself.
5            MR. BAKHTIARI:  Yes, Your Honor.
6            THE COURT:  This is totally irrelevant, and I'm just
7    not going to hear it.
8            MR. BAKHTIARI:  Yes, Your Honor.  May we proceed?
9            THE COURT:  Well, it depends.  What are you going to
10   do next?
11           MR. BAKHTIARI:  We are out of the other civil docket
12   suits right now, and we are just simply focusing on the
13   interaction that we had personally together.
14           THE COURT:  All right.  That very well could be
15   relevant.
16   Q    (BY MR. BAKHTIARI) Mr. Hiles, who is that letter to?
17   A    It purports to be a letter to Jeff Ayers.
18   Q    Who is Mr. Ayers?
19   A    He was at the time, and is today, the general counsel of
20   Career Education Corporation.
21   Q    May I ask you to go to the last paragraph, which is the
22   second page of that letter, please?  It starts with "I do not
23   believe there is any liability."
24   A    Do you have a question?
25   Q    May I ask you to read that out loud for the record?
```

56

1  A    "I do not believe there is any liability upon Missouri

2  College and CEC for this issue.  Students hear the word of

3  mouth and follow leads and look for jobs, but since I have

4  received at least twenty calls inquiring about masseuse jobs

5  in Vegas from Missouri College students, I think it would be

6  proper for your office to make sure such misunderstanding and

7  misconception is not being disseminated among your students by

8  teachers or any possible positing on your physical or

9  electronic domains and premises."

10 Q    Is this demanding any settlement from your client?

11 A    This is the beginning of a contrived scheme by you to

12 file a lawsuit against my clients, which you ultimately filed.

13 It is my belief that your lawsuit was based upon false and

14 phony email messages that you created that support or

15 supported your eventual claim that you were pimping girls in

16 the Las Vegas masseuse industry and that that led to your

17 creation of a letter on Missouri College letterhead, not

18 signed by anyone at Missouri College, letterhead only used at

19 the time when you were on the faculty and not used for months

20 thereafter or at the time the letter was sent or even now, and

21 that you created that letter to send to St. Louis media

22 outlets so you would gin up a defamation lawsuit against

23 Career Education Corporation and Missouri College.

24 Q    May I ask you to look at the first page, please?  What's

25 the date on that letter?

1  A    March 19, 2010.

2  Q    And when was the lawsuit filed in 2010?  Was that

3  October, by any chance?

4  A    I don't know.  What does it matter?

5  Q    Specifically to that email, is that posing threats to

6  anybody or you?

7        MR. SAUER:  Objection, irrelevant, beyond the scope

8  of direct, and I would say asked and answered.

9        THE COURT:  Sustained.

10       MR. BAKHTIARI:  Yes, Your Honor.  We will move on.

11       THE COURT:  Go ahead.

12 Q    (BY MR. BAKHTIARI) Is that an answer to your discovery

13 requests in the civil suit?

14 A    Give me a moment.  I'm unable to say that it is.  It's

15 not been signed by the plaintiff, and it has not been

16 notarized.  I don't know if this is an answer to discovery.

17 Q    Did you -- in your law firm, in your evidence room, did

18 you receive, by any chance, a computer and an external hard

19 drive in answer to discovery request?

20 A    I received a broken and tampered-with computer and a

21 broken and tampered-with hard drive that you surreptitiously

22 delivered to my law firm three hours before you told me that

23 someone else would deliver it and about forty-five minutes

24 after you told me that you were north of Chicago.

25 Q    Did you get a computer and external hard drive?

1   A    Depends on your definition of "computer."  If it involves

2   a functioning computer and a functioning hard drive, the

3   answer is no.

4   Q    Was that computer and hard drive delivered into your mail

5   room in Husch Blackwell's building?

6   A    Yes.

7   Q    Is that a secured room or anybody can just walk in?

8   A    Anybody can walk in when they bum-foozle one of our

9   clerks, one of our document clerks, by saying that you're

10  there to meet with one of my colleagues, which is what you did

11  that day, and she used her pass-card to let you in.

12  Q    So your staff members let anybody into that evidence

13  room?

14       Yes, Your Honor, I will proceed.  I will proceed.  I

15  realize that.

16       Mr. Hiles, may I ask you to take a look at the

17  content of that discovery answer?

18  A    Mr. Bakhtiari, just to make it clear, I'm not agreeing

19  that this is a discovery answer.

20  Q    Yes.

21       MR. SAUER:  Judge, I'm going to object to questions

22  to a document that has --

23       THE COURT:  Yeah.  No relevance, sustained.

24       MR. BAKHTIARI:  Yes, Your Honor.  I will proceed, if

25  I may, to Exhibit No. 11.  This is the last exhibit, Your

```
 1    Honor.

 2              THE COURT:  All right.

 3    Q    (BY MR. BAKHTIARI) Thank you.  What is that

 4    correspondence, Mr. Hiles?

 5    A    This is a letter from my partner, Max Carr-Howard, to

 6    Robert Livergood, the Assistant U.S. Attorney, one of the

 7    Assistant U.S. Attorneys here in St. Louis.

 8    Q    And are you aware why that correspondence was made to the

 9    U.S. Attorney's office?

10    A    Yes.

11    Q    May I ask you why?

12    A    Yes.  My client had received a CD from you which we

13    suspected contained pornographic material based upon some

14    contentions you had made about its content.  In particular,

15    there was a contention about a woman with a nude photo of her

16    child and one of this woman grinding her two-year-old son.  So

17    we submitted the CD or DVD, I'm not sure which it was,

18    apparently it was a CD, to the U.S. Attorney's office to ask

19    them to open it and to view its contents so that there would

20    not be any allegations of impropriety on your part that my

21    client had tampered with the CD because you were known to us

22    to be a person suspected of tampering with emails, with

23    letters, with photographs, and with other electronic -- or

24    through the use of electronic media altering photographs.

25    Q    Is that fair to say that that is simply your allegation
```

1  at this juncture?

2  A    It's my absolute belief, sir.

3  Q    Okay.  Now, may I ask you to proceed to the second or

4  third page?  It starts with "Dear Mr. Ayers."

5  A    You're talking about another letter now that was included

6  in this document.

7  Q    May I simply just ask you, just the first paragraph would

8  do.  May I ask you to read that for me, for the record,

9  please?

10 A    "I reluctantly have filed another suit against your

11 subsidiary, Missouri College.  Upon filing my previous suit in

12 2010, I urged you to allow us conduct a thorough discovery to

13 identify the causes of the issues, but through your counsel

14 you flooded the court with your pleas of an early resolution

15 as it appears you merely tossed the matters under the carpet."

16      MR. SAUER:  I object to any further questions on this

17 document as irrelevant and beyond the scope of the direct

18 examination, and also, I now believe that he's trying to put

19 in his own prior hearsay statements without testing them by

20 cross-examination.

21      THE COURT:  Well, you know, it does again seem to me

22 to be totally irrelevant, but I could be missing something.

23 What's your claim that that has any relevance to this case?

24      MR. BAKHTIARI:  Your Honor, Mr. Hiles and Mr. Sauer

25 have been in conjunction portraying to this Court and even

1  asserting clearly that I have been soliciting nuisance

2  settlements from his clients.  This is the letter to the

3  general counsel which is asking for a thorough discovery.

4  Nowhere in this letter is asking for a dime of settlement.

5          Now, Mr. Hiles has mentioned it in his statements

6  while he's been on the stand, so has Mr. Sauer on his records,

7  that we have violently and forcefully tried -- or I have

8  violently and forcefully tried to influence a civil suit.

9  Why?  So I could get nuisance settlements out of that civil

10  suit.

11          The record is showing clearly that I have been

12  advocating and forcefully requesting a thorough discovery, and

13  nowhere on any of these documents is mentioned any settlement

14  proposals or any settlement demands, and it's just speaking to

15  the underlying premise of this whole allegation.

16          THE COURT:  All right.

17          MR. SAUER:  I renew my objection on the grounds of

18  relevance and beyond the scope and the fact that he's trying

19  to put in his own prior self-serving hearsay statements for

20  the truth of the matter asserted, which have limited or no

21  evidentiary value.

22          MR. BAKHTIARI:  I have only two more questions for

23  Mr. Hiles, with no exhibits, and then I'll be done with this

24  witness, Your Honor.

25          MR. SAUER:  I don't object to that, Your Honor.

1          THE COURT:  All right.  Go ahead.

2          MR. BAKHTIARI:  I'm glad you're happy, sir.

3          THE COURT:  Wait.  Don't, please.  Stay focused.  I

4   believe this is totally irrelevant, but again, there could be

5   something I do not understand, and I will overrule it.  Go

6   ahead.

7   Q   (BY MR. BAKHTIARI) Mr. Hiles, has Mr. Sauer applied for

8   any job with Husch Blackwell before at any time?

9   A    Not to my knowledge.

10  Q    Has he spoken to you or any of your colleagues about

11  possibly obtaining a position with the private firm of Husch

12  Blackwell or associated firms?

13  A    He has certainly not spoken to me about that.

14  Q    Are you a --

15          THE COURT:  That's two.  What's the third one?

16  Q    Well, are you a partner in that firm?

17  A    Yes.

18  Q    How many years have you been with that firm?

19          THE COURT:  Thirty-one, I think he said.

20          THE WITNESS:  Thirty-two, actually.

21          THE COURT:  All right.

22          MR. BAKHTIARI:  Great.  Your Honor, I have no further

23  questions for Mr. Hiles.

24          THE COURT:  Any redirect?

25          MR. SAUER:  No, Your Honor.

1        THE COURT:  You may step down.  You are excused.

2   Thank you.

3        THE WITNESS:  Shall I leave the exhibits?

4        THE COURT:  Would you deliver them back to your

5   counsel, and he can give them back to the defendant.

6        You may call your next witness.

7        MR. SAUER:  The Government calls Glenn Fogarty.

8        Judge, I'm being told by Mr. Bakhtiari that he has a

9   witness present who has a conflict coming up.  He would like

10  to call that witness out of order before the conclusion of the

11  Government's witnesses.

12       THE COURT:  All right.

13       MR. SAUER:  I'm not sure who the witness is, but I

14  don't object.

15       THE COURT:  All right.

16       MR. BAKHTIARI:  Attorney Hoekel practices law and is

17  a member of the bar in this court and also other courts, and

18  he has a pressing schedule today.  May I depose him so he can

19  leave?

20       THE COURT:  You do not depose him.  You may inquire

21  of him.

22       MR. BAKHTIARI:  Yes, Your Honor, if I may.

23       THE COURT:  All right.

24            **(WITNESS SWORN BY THE CLERK.)**

25       THE COURT:  You may inquire.

1      **MARSHALL R. HOEKEL,**

2  **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

3  **FOLLOWS:**

4                    **DIRECT EXAMINATION**

5  **BY MR. BAKHTIARI:**

6  Q    Thank you, Mr. Hoekel.  Good morning to you.

7  A    Good morning.

8  Q    When was the first time when you and I met?

9  A    Was it 2004?

10 Q    Would that be fair to say was it in March of 2005, by any

11 chance?

12 A    That sounds right.

13 Q    And what was the purpose of our initial meeting?

14 A    Were you in deportation proceedings at the time, or did

15 we meet about your civil case against the University of

16 Missouri?

17 Q    Do you recall if we met about a pair of civil suits

18 against University of Missouri?

19 A    That would be one reason that we met, yes.

20 Q    And did you represent me in these cases?

21 A    Yes.

22         THE COURT:  You have what, two Exhibit 1's?  Oh,

23 that's okay.  We'll call this Exhibit 11.  How's that?

24 Q    Mr. Hoekel, were there a conglomerate of cases against

25 University of Missouri that went on for about five years?

1    A    Yes.

2    Q    The first item on that list, is that a case before Judge

3    Fleissig?

4    A    Yes.

5    Q    Did you represent me in that case?

6    A    Did I -- I don't remember if I entered on that case or

7    not.

8    Q    Was that --

9    A    I represented you in the series of cases, but probably.

10   Q    Was that case later on dismissed on summary judgment

11   filed by Mr. Hoskins of University of Missouri?

12   A    Yes.

13   Q    Would that be fair to say we put hundreds of hours on

14   that case?

15   A    It was a lot of time.  It was.

16   Q    Was that case dismissed on summary judgment based on a

17   motion filed by Mr. Hoskins?

18   A    I believe so.

19   Q    Did Mr. Hoskins or any of his colleagues claim to have

20   received any kind of threats because of that summary judgment

21   motion?

22   A    No.

23   Q    May I ask you to look at the second item?  Is that a case

24   before Honorable Carol Jackson of this district court?

25   A    Yes.

1    Q    Did you represent me in that case?

2    A    Yes.

3    Q    Did we put hundreds of hours in that case possibly?

4    A    Yes.

5    Q    Was that case dismissed on summary judgment?

6    A    Yes.

7    Q    Did Mr. -- did the attorneys involved in that case, being

8    Mr. Hoskins or Mr. Hawke, either of them received any threat

9    after filing a summary judgment?

10   A    No.

11   Q    That you know of?

12   A    Correct.

13   Q    May I ask you to look at the third item?  Is that a case

14   before Judge Medler?

15   A    Yes.

16   Q    Are these three cases related University of Missouri

17   cases?

18   A    Yes.

19   Q    Did you represent me before Judge Medler?

20   A    I don't think I did.

21   Q    Was I pro se before Judge Medler?

22   A    I believe so.

23   Q    Was that case dismissed or resolved before Judge Meddler?

24   A    I don't know.

25   Q    Do you recall that we had a one-day-long mediation with

67

1    University of Missouri in 2005 with Honorable Carl Gaertner as

2    the mediator?

3    A    Yes.

4    Q    Did we settle that case?

5    A    Not at that time.

6    Q    So we -- was that be fair to say that it was a

7    one-day-long mediation and we could not settle it?

8    A    I believe so.

9    Q    Is that fair to say that we revisited the same issue in

10   summer of 2008 with Mediator Mike Geigerman?

11   A    Yes.

12   Q    Is that fair to say it went on for several days this

13   time?

14   A    It went on for at least one -- well, yes.  In total, yes.

15   Q    Was that resolved at the end, after that one-month

16   mediation with Mike Geigerman?

17   A    No.

18   Q    Do you recall after either of these long mediations if

19   the mediator or either of the witnesses or either of the

20   attorneys involved received any threats?

21   A    I do not recall they received any threats.

22        MR. BAKHTIARI:  Thank you.  Your Honor, I have

23   Exhibit No. 2 for this witness, just two exhibits for him.

24        THE COURT:  Well, are we going to ask if he made --

25   you made threats to anybody else, because if you are --

1        MR. BAKHTIARI:  No, Your Honor.

2        THE COURT:  Because if he did, it's not relevant to

3   this case.

4        MR. BAKHTIARI:  Yes, Your Honor.  And that's probably

5   the end of, you know, other possible witness questions that

6   has been annoying the Court, and I apologize about that.

7        THE COURT:  Well, I just want to make sure -- it's

8   not annoying me.  I have a responsibility to make rulings

9   based on what I hear, and what I've heard so far is the fact

10  that you have made -- not made threats to anybody else is not

11  relevant to this case.

12       MR. BAKHTIARI:  Yes, Your Honor.

13       THE COURT:  And it's not relevant.

14       MR. BAKHTIARI:  The premise here, Your Honor, being

15  that a five-year-long litigation, which has been taking about

16  a thousand hours, did not promote a violent threat.  How could

17  a simple run-of-the-mill sanction motion push this individual

18  to go pull out a gun and threaten an innocent family?  That's

19  basically the thought and the rationale behind these lines of

20  question.

21  Q   (BY MR. BAKHTIARI) Mr. Hoekel, may I ask you to read that

22  news article for the Court?  And I'm sorry if it's had a bad

23  print.  Thank you, Mr. Hoekel.

24  A    Okay.

25  Q    May I ask you to read this aloud for the Court?

1    A    You want me to read the entire --

2    Q    If you would, kindly.

3    A    All right.  "Since he left MST, Missouri Science and

4    Tech, in 2004, Alireza Bakhtiari, an Iranian national and grad

5    student invitee to the MST, filed at least four lawsuits in

6    Missouri state and federal courts against the university and

7    former Dean Lutz, as an individual defendant --

8         MR. SAUER:  I'm going to object to the reading of

9    this document.

10        THE COURT:  Yeah, I can read it.  I can read it.

11   Just give me a second.  I'll read it.  Just a second.  Okay.

12   I have read it.

13   Q    Thank you, Your Honor.

14        Mr. Hoekel, does that sound right, the number of

15   lawsuits that I filed against University of Missouri in pro se

16   or through counsel?

17        MR. SAUER:  Judge, I now would like to interpose an

18   objection to the admissibility of this document.  The source

19   for the allegations in this article, as I understand it, was

20   Mr. Bakhtiari himself speaking to reporters; so it is

21   self-serving hearsay.

22        Further, what's not being presented to the Court is

23   the fact that this newspaper later presented a retraction of

24   allegations in this article.  Therefore, there are no

25   additional reliability to whatever is stated in this article

1  that's before the Court.

2         Also, I further renew my objections on the grounds of

3  relevance.

4         THE COURT:  All right.  Well, I believe I could well

5  sustain those objections, but I will overrule it at this time.

6  Go ahead.

7         MR. BAKHTIARI:  Thank you, Your Honor.  And the

8  reality of it is that is a press -- official press release by

9  University of Missouri.

10        THE COURT:  Just ask the question.

11 Q   (BY MR. BAKHTIARI) Mr. Hoekel, does that sound about

12 right, the number of lawsuits filed in pro se and through

13 counsel, to the best of your memory?

14 A    I don't believe there were -- I don't believe there were

15 any lawsuits in state court that I was aware of, and I think

16 that the lawsuits in the federal court in this district were

17 the ones that you presented to me in Exhibit 1.

18 Q    Do you recall --

19 A    Which would be three lawsuits.

20 Q    Did we have, by any chance, a defamation suit before

21 Judge Dierker in the City of St. Louis Circuit Court?

22 A    Now that you mention it, yes.

23 Q    Was that case later on moved to the Rolla Circuit Court

24 and then to federal court?

25 A    That sounds correct.

1   Q    Do you recall if at the end of those suits the matters

2   were globally settled by University of Missouri?

3   A    I wasn't involved after the mediation with Mike

4   Geigerman, so I don't know whether they were ultimately

5   settled or not.

6   Q    Were you informed if, as a result of those lawsuits, the

7   dean was terminated and the university restructured?

8   A    I don't know that.

9   Q    Thank you.  Mr. Hoekel, throughout those cases that you

10  and I litigated together, did I assist in the legal research?

11  A    Yes.

12  Q    Was I actively involved in the preparation of the motions

13  and the briefs to the court?

14  A    Absolutely.

15  Q    Mr. Hoekel, with utmost frankness to the Court, in your

16  perspective, in your perception, am I a litigious man?

17  A    Well, if you count the number of lawsuits that you file,

18  you filed your share, which, of course, you know, but I don't

19  believe that --

20  Q    Is that yes or no, litigious?

21  A    I suppose so, yes.

22  Q    Do you think, based on five years or seven years of

23  knowledge, am I a violent man?

24  A    No.

25          MR. SAUER:  Objection.  Calls for a --

```
 1              MR. BAKHTIARI:  Your Honor, he answered.

 2              THE COURT:  He's already answered.

 3    Q   (BY MR. BAKHTIARI) He's already answered.

 4              What did you say the answer --

 5    A   I said no.

 6    Q   Did we depose about thirty faculty and students of

 7    University of Missouri together?

 8              MR. SAUER:  I will object.

 9              THE COURT:  Sustained.  Sustained.

10    Q   Yes, Your Honor, I will proceed.

11              Do you recall -- were you aware of my service to St.

12    Louis County Police as a cyber forensics expert?

13              MR. SAUER:  Objection to the leading form.  Objection

14    to the relevance.

15              THE COURT:  Overruled.

16    A   I believe I knew something about that.

17    Q   Was it somewhat true that I was a volunteer cyber

18    forensics expert for St. Louis Police?

19              MR. SAUER:  Objection, lack of foundation.  His only

20    basis for it would be hearsay.

21              THE COURT:  It calls for his knowledge.  Overruled.

22    A   I believe so.

23    Q   Did you see news clips about those works on TV?

24    A   Yes.

25    Q   Did you represent me in a civil suit car accident a few
```

1   months ago?

2   A    Yes.

3   Q    Did we have a video deposition with the opposing counsel

4   in that suit?

5   A    I think there were two.

6   Q    Was I -- did I become antagonistic and hardheaded against

7   the opposing counsel, based on your perception and knowledge?

8   A    No.

9   Q    Did the counsel turn around and say I had threatened them

10  before or after the suit?

11  A    No.

12          MR. BAKHTIARI:  Thank you.  No further questions for

13  Mr. Hoekel, Your Honor.

14          THE COURT:  Any questions?

15          MR. SAUER:  No, Your Honor.

16          THE COURT:  You may step down.  You are excused.

17  Thank you.

18          MR. SAUER:  Your Honor, Government calls Glennon

19  Fogarty.

20          THE COURT:  Okay.

21          MR. SAUER:  Judge, if I may, I also at this time

22  would like to invoke the rule.  There are persons present in

23  the courtroom.  I don't know who they are.  They may be

24  witnesses that Mr. Bakhtiari plans to call.  I wasn't notified

25  that they might be witnesses, but to the extent that anyone

74

1    present in the courtroom plans to testify as a witness, I'd

2    ask that they be excluded.

3            THE COURT:  Okay.  He said he had two.  Do you have

4    one more witness?

5            MR. BAKHTIARI:  Your Honor, we notified Mr. Sauer --

6    or at least it is to my knowledge that Attorney Smith notified

7    Mr. Sauer that we intend to call Mr. Hoekel, Mr. Salazar, and

8    Ms. Sharon Weiss as witnesses.

9            THE COURT:  Okay.  If they're in the courtroom,

10   they'll need to excuse themselves at this time.

11           MR. BAKHTIARI:  Your Honor, Mr. Salazar and Ms. Weiss

12   are the fact witnesses, and I intend to call upon them now.

13           THE COURT:  Okay.

14           MR. BAKHTIARI:  Whatever the Court directs them, I'm

15   sure -- do you need them to leave?

16           THE COURT:  No.  They just need to be outside the

17   courtroom.

18           MR. BAKHTIARI:  Oh.

19                   **(WITNESS SWORN BY THE CLERK.)**

20           THE COURT:  You may inquire.

21           MR. SAUER:  Thank you, Your Honor.

22                       **GLENNON FOGARTY,**

23   **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

24   **FOLLOWS:**

25                       **DIRECT EXAMINATION**

1   **BY MR. SAUER:**

2   Q    Please state your name.

3   A    Glennon Fogarty.

4   Q    What is your occupation?

5   A    I'm an attorney.

6   Q    And where do you work?

7   A    Husch Blackwell.

8   Q    Have you been involved in a litigation involving a

9   client, Missouri College, and a pro se litigant, Alireza

10  Bakhtiari?

11  A    Yes, I have.

12  Q    And have you been -- have you worked in connection with

13  Mr. Brad Hiles on that litigation?

14  A    Correct.  Mr. Hiles is the lead counsel in the case.

15  Q    And you assist him in the -- have you assisted him in

16  that representation?

17  A    Yes, I have.

18  Q    Directing your attention to Martin Luther King day of

19  this year, Monday, January 16, 2012, did you receive

20  information from Mr. Hiles on that day?

21  A    Yes.  It was a very memorable call.  I received a call

22  early in the morning on that holiday, Monday morning, and Brad

23  was very serious and very gravely concerned.

24  Q    And did he advise that he received an email that caused

25  him concern?

1    A    Yes, he did.

2    Q    And did he describe that email to you?

3    A    He did.

4    Q    Did you later review the contents of that email?

5    A    I did.

6    Q    On that day, January 16, 2012, did you take any steps to

7    put Mr. Hiles in contact with law enforcement?

8    A    Yes, I did.

9    Q    What were those steps?

10   A    We contacted Mr. Jim Crowe, who is the chief of the

11   criminal division of the U.S. Attorney's office.

12   Q    Did you request that a federal investigation be commenced

13   relative to that email?

14   A    Mr. Hiles did, I believe, yes.

15   Q    And to your knowledge, was a federal investigation

16   commenced?

17   A    Yes.

18   Q    I want to direct your attention to two days later,

19   Wednesday of the same week, January 18 of 2012.  On that day

20   did you have occasion to travel to Mr. Bakhtiari's residence?

21   A    I did.

22   Q    What was the purpose of your visit?

23   A    Judge Limbaugh had entered an order which required, among

24   other things, Mr. Bakhtiari to allow for an inspection, entry

25   into his house, slash, office, and inspection of all computers

1    and electronic storage devices.

2    Q    Was that house located at 3889 Walsh in the city of St.

3    Louis?

4    A    That's correct.

5    Q    When you arrived at that house that day, did you enter

6    the home?

7    A    I did.

8    Q    And did you attempt to inspect computer equipment?

9    A    Yes.

10   Q    What kinds of equipment were you directed or authorized

11   to inspect and examine pursuant to the terms of the order?

12   A    The order specified -- I don't have it in front of me,

13   but I know the order specified computers and all electronic

14   storage devices, so that would have included anything that

15   would have stored electronic data.

16   Q    Did you make attempts to locate computers and electronic

17   storage devices in the home?

18   A    Yes.

19   Q    Did you locate any?

20   A    And just to clarify the record, I was there with a

21   consultant, and there was a court reporter.  And we did locate

22   four shelves of what I would call computers, but none of them

23   had hard drives.

24   Q    Did there come a point during the course of this visit

25   where Mr. Bakhtiari drew you into a bedroom?

1    A    Yes.  I had -- in addition to asking for the production

2    and inspection of computers, we had also asked for cameras

3    because cameras are electronic storage devices, and there are

4    photographs that are at issue in that matter and that were the

5    basis of motions of sanction.  So we were asking -- I was, in

6    fact, asking him to produce all computers and cameras for

7    inspection, and he said -- I asked him if there were any more

8    cameras, and he said no.  And then he said, "Well, I remember

9    I have another camera I need to show you."  And he asked me to

10   follow him, and I did.

11   Q    And where did you go when you followed him?

12   A    He took me to his bedroom and then reached underneath his

13   bed and pulled out a loaded rifle with a scope on it and

14   said --

15   Q    Go ahead.  What did he say?

16   A    He said, "Do you want to look through the scope?  It has

17   cross hairs."

18           And I said, "Is that a camera?"

19           And he said, "Do you want to look through it?"

20           And I said, "Does it record?"

21           And he said, "Do you want to look through it?"

22           And I said, "If it's not an electronic storage

23   device, I don't need to see it."

24   Q    At the time he displayed -- how did you know the firearm

25   was loaded?

1   A     So when I got into the room, I didn't initially know it

2   was loaded, but then right near at the end of that

3   conversation, he did what I would describe as a bolt action,

4   and pulled out a bullet and looked at me and extended his arm

5   and said, "Do you want a bullet?"

6            And I said, "I don't need a bullet.  Please put it

7   away."

8            And then he put the bullet back in the gun, did the

9   bolt action again.

10  Q     And did he place the gun anywhere?

11  A     Then he placed the gun underneath the bed.  And I backed

12  out of the room so I could watch him as he walked towards me.

13  Then he walked past me in the adjoining room, and then I

14  followed him to the next place.

15  Q     At the time that you observed him with that weapon, had

16  you had a chance to view the email with the cross hairs on the

17  wedding photographs that Mr. Hiles had received three days

18  earlier?

19  A     Yes.  I had -- this particular right of entry and

20  inspection happened on January 18, and I had seen the email

21  sent to Mr. Hiles on January 16, two days before.

22  Q     Did you ask -- in the course of your visit to his home,

23  did you at any time ask him to display any weapons to you?

24  A     I did not.

25  Q     Did you ask him if he had any scopes or anything like

1    that?

2    A     I did not.

3    Q     Did he indicate to you that he believed that this scope

4    on this rifle had recording capacities of some kind?

5    A     Could you repeat that?

6    Q     Did he indicate whether or not he believed that that

7    scope could actually record, it could actually function as a

8    camera?

9    A     He -- so during that encounter he was characterizing the

10   scope as a camera, and I was inquiring of him, "Does it

11   record?"  And it seemed to me that he was using that exchange

12   to use the word "cross hairs" to me.  But at that time he

13   never indicated it was recorded.

14        Later on, at the -- near the conclusion of the

15   inspection, we made a record on the -- and Mr. Bakhtiari was

16   under oath and made a record, and during that record Mr.

17   Bakhtiari, I think, may have made the attempt to try and say

18   "certain scopes record," but I don't recall whether he did or

19   didn't.  But he clearly acknowledged that the scope on the

20   rifle that he displayed to me didn't -- that that one did not

21   record.

22   Q     When you made a record, was that record transcribed?

23   A     It was.

24   Q     In the course of that record did he continue to use the

25   words "cross hairs" or "cross hair"?

1    A    He used the word "cross hairs" both in the bedroom, when

2    he initially displayed the gun, and then he used the word

3    "cross hairs" during the recorded examination.

4    Q    How did you react to -- or what message, if any, did you

5    perceive in his display of this rifle for you, his use of the

6    word "cross hairs," and his displaying of the bullet in the

7    rifle chamber?

8    A    I would say I had at least three immediate reactions.

9    The fist one was obviously concern about there being a loaded

10   rifle involved in this entry and inspection, and then doing

11   the bolt action and showing that it's loaded and extending the

12   bullet obviously gave me potential concern about there being a

13   loaded rifle in the premises, but when he used the word "cross

14   hairs," it immediately struck me that he was trying to -- at

15   least I believe he was trying to put in my mind the email that

16   had been sent to Mr. Hiles.

17         And I guess I say that in two respects.  I believe

18   that he was trying to send the message that he knew of or he

19   had sent that email and that he had the ability to fulfill the

20   threat in there, in my opinion.

21   Q    Did you personally experience fear on that day?

22   A    Definitely.

23   Q    And have you continued to experience fear as a result of

24   both the email and this display of the rifle?

25   A    I have.

1    Q     Have you experienced fear for your family as well?

2    A     Yes, I have.

3    Q     And have you taken certain steps to ensure your family's

4    safety?

5    A     That's correct.  We no longer answer the door until we

6    know who is at the front door.  And, for example, on Halloween

7    this year, we weren't open for Halloween because people come

8    to the door in masks and you don't know who they are.

9          MR. SAUER:  No further questions, Your Honor.

10          THE COURT:  You may inquire.

11                          **CROSS−EXAMINATION**

12   **BY MR. BAKHTIARI:**

13   Q    Good morning, Mr. Fogarty.  Mr. Fogarty, the exhibit

14   which is before you or in front of you, is that the order that

15   Honorable Limbaugh issued authorizing you to collect any

16   digital storage media from my house?

17   A     Okay.  Exhibit 1 does appear to be one of the orders

18   issued by a Judge Limbaugh, and it does direct that plaintiff,

19   which was Mr. Alireza Bakhtiari, shall produce all computers

20   and all electronic storage devices that plaintiff has utilized

21   during the time period of January 1, 2009, to present, for

22   inspection and forensic imaging, yes.

23   Q    Mr. Fogarty, did you, on January 18, morning, on 9 AM,

24   appear at my house with a court reporter and a consultant in

25   order to execute that order?

1    A    I did.

2    Q    Did you stay in the house until late hours in the

3    afternoon, until about 5 PM, with your court reporter and your

4    consultant?

5    A    I don't know the time we left.  It was in the afternoon.

6    Q    Late in the afternoon; is that fair to say?

7    A    The transcript might reflect that, but what time we left,

8    I don't recall the specific time.  I would say it was in the

9    afternoon.

10   Q    Did you collect some items from my residence?

11   A    The consultant did collect items, yes.

12   Q    Do you recall what they were?

13   A    I don't have a list of them with me.

14   Q    Mr. Fogarty, can I ask you to, as quickly as you can,

15   skim through that article, and then if you could, please,

16   explain to me what is that article reflecting?

17   A    This article reflects, I guess, certain shooters want to

18   try and photo or video an animal you chose not to shoot and

19   show your friends.  And it allows shooters to video their

20   rifle hunt.

21   Q    Is that a scope on the -- which is placed on the rifle?

22   A    This appears to be a scope that does record.

23   Q    Is that a flash drive that you -- that goes on the side

24   of that scope in order to store digital information?  Do you

25   see that?

1   A   I do see a fixture depicting a point where you can put a

2   flash drive in that device.

3   Q   According to Judge Limbaugh's order, is that flash drive

4   recoverable and discoverable per that order?

5   A   If Mr. Bakhtiari or the others governed by the order

6   owned one of these, it would be.

7   Q   Does that order say any digital storage material is

8   discoverable?

9   A   Do you know what paragraph you're referring to?

10  Q   It is in that order.

11  A   Do you mean electronic storage device?

12  Q   Yes.

13  A   It clearly marked electronic storage device, but you

14  indicated that your scope did not have those capabilities.

15  Q   That is correct.  Is that your recollection or do you

16  recall that your consultant inquired if I had a rifle and if

17  my rifle had digital scope on it?

18  A   In fact, if you read page 86 of the transcript in which

19  you are under oath, you state to me:  "You asked if I had a

20  camera.  I said no.  But then I remembered I had another

21  camera I wanted to show you."

22          And so, no, I dispute your contention that the

23  consultant asked you to display any weapon in the record on

24  page 86.

25  Q   That is correct.  That article shows you that some scopes

1    have the capacity to digital -- to digitally store data.

2    Doesn't that article show you that kind of scope, Exhibit 2?

3    A    It tells me that in May of 2012 someone printed something

4    from a manufacturer that has a scope that allows hunters to

5    video what they look through their scope.

6    Q    So would that be fair to say that when you come with that

7    order to my house, you want to make sure you go through every

8    corner to look for digital storage material, including on a

9    scope of a rifle because some scopes store data?

10   A    I asked if you had any more cameras.

11         You said no.  And then you said, "I have another

12   camera to show you."

13         And that's when you invited me into that room and

14   pulled out the loaded gun.

15   Q    Is that scope a camera, a digital scope?  Is that also a

16   camera?  Does that magnify?

17   A    You told me it wasn't a camera; that it did not record;

18   that it did not have any storage capability.

19   Q    Did you, by any chance, suggest to the government

20   attorney to produce your consultant as a witness today?

21   A    My consultant?

22   Q    Your IT consultant that you brought to my house, the man

23   who inquired if the scope was a digital scope.

24   A    If --

25   Q    Why isn't he today to testify?

```
1              THE COURT:  Wait a minute.  Do you under -- there was

2     three or four questions here.  Which one --

3     A    If you would like to call the consultant, we would make

4     him available via phone right now, Mr. Bakhtiari.

5     Q    It is the burden of the attorney to prove what they want

6     to prove.  But if I may move on, what time in the morning was

7     it that you and I had that exchange, alleged exchange, in my

8     room, in my bedroom?

9     A    I don't know.

10    Q    Is it your contention that sometime in the morning I

11    pulled out a gun and posed such horrible threats to you, and

12    then you stayed in my house, cool like a cucumber, until late

13    in the afternoon?

14    A    My concern remains about the loaded gun.  I did not think

15    you were likely to shoot me in front of the consultant or the

16    court reporter, but we were very wary how we backed out of

17    that room.  And then if you may recall, we were always with

18    you until the very conclusion of the transcript, when you went

19    to the back of the home and all three of us ran out of the

20    front of your house.

21    Q    Did you feel any threat throughout that day while you

22    were in my house?

23    A    When you initially displayed the gun, I was very alarmed,

24    yes.

25    Q    But you didn't step out to call the police?
```

1   A    I wanted to make a record because I had in my mind that

2   you were sending a message -- in my belief, in my personal

3   opinion, you were sending a message relative to the email that

4   had been received, and I wanted to make that record.  But I

5   was very cautious about it and I did contact law enforcement

6   after that was concluded.

7   Q    Do you have any record here or either of them here that

8   you had called that day and said:  I feel threatened;

9   somebody that I'm in a heated civil suit with right now pulled

10  out a gun on me?

11  A    Yes.  He is here.

12  Q    And you called Mr. Follmer and said:  I feel threatened;

13  Bakhtiari pulled a gun on me?

14  A    I was very concerned about it.

15  Q    But you managed to stay in my house several hours after

16  that?

17        THE COURT:  You've covered that.  Move along.

18  Q    Yes.  Now, is it again your contention that it wasn't

19  your request to inspect the scope to see if it's digital or

20  not?

21  A    Not only wasn't it my request, on page 86 of the

22  transcript you acknowledge that I asked to see a camera, and

23  that's when you led me to see the gun.

24  Q    It was not the -- it was not the indication or request of

25  your consultant either that some of the scopes have the

1  digital storage capacity?

2         MR. SAUER:  This has been asked and answered.

3         THE COURT:  It has been.  Sustained.

4         MR. BAKHTIARI:  I have no further questions for Mr.

5  Fogarty, Your Honor.

6         THE COURT:  Any redirect?

7         MR. SAUER:  Very briefly, Your Honor.

8                  **REDIRECT EXAMINATION**

9  **BY MR. SAUER:**

10  Q    Mr. Fogarty, you referred to page 86 of this transcribed

11  interview that occurred on January 18 of 2012, at 3889 Walsh;

12  is that correct?

13  A    That's correct.

14  Q    Do you remember the exact words of that interview?

15  A    There is a statement.

16  Q    Let me ask you this.  Would it refresh your recollection

17  if I were to give you a copy of the interview as to the exact

18  words that Mr. Bakhtiari used?

19  A    That would help me, yes.

20         MR. SAUER:  Your Honor, may I approach the witness?

21         THE COURT:  You may.

22  Q    (BY MR. SAUER) I'm handing you, for the record, a copy of

23  the transcription of that interview.  I'd like to direct your

24  attention to page 86.  And can you just read into the record

25  the question and the answer and that you refer to or

1    summarized in your direct testimony and on cross-examination?

2    A    I'm going to read the question and the answer.

3         Question:  "Earlier today, when we were in your

4    house, and at some point you pull" -- it says "you pull" as

5    opposed to "pulled" -- but I'll start over.

6         "Earlier today, when you were in your house, and at

7    some point you pull a rifle from underneath your bed and show

8    it to me."  That's the question.

9    Q    That's the question by you?

10   A    By me.

11   Q    And then what is the answer by Mr. Bakhtiari?

12   A    The answer is, and I quoted some of this earlier, but I

13   will read the whole answer:  "Well, you demanded to inspect

14   anything that has a camera on it, and there was one box that

15   you opened.  You started saying, 'Where is the camera for

16   this?' and then there was no camera for that item.  You asked

17   me" -- this is Mr. Bakhtiari speaking.  "You asked me if I had

18   any other cameras.  I said no.  And then I remembered there is

19   a camera on the rifle, on the deer hunting rifle, and I showed

20   you that."

21   Q    Later on in that --

22   A    And if I could complete the answer, that's when he

23   references "cross hair."  "There is a deer hunting rifle that

24   I have, and that has -- that is equipped with a camera and has

25   a cross hair on it."

```
 1              MR. SAUER:  That's all the questions I have, Your

 2     Honor.

 3              MR. BAKHTIARI:  May I pose a couple more, Your Honor?

 4              THE COURT:  All right.

 5                      RECROSS-EXAMINATION

 6     BY MR. BAKHTIARI:

 7     Q    Mr. Fogarty, may I ask you to take a look at page 86,

 8     line 7?  May I ask you to read that aloud for the record,

 9     which is my answer?

10     A    I'll read it.  I've already read it once, but I'll read

11     it again.

12              "Well, you demand to inspect anything that has a

13     camera on it.  And there was one box that you opened.  You

14     started saying, 'Where is the camera for this?' and then there

15     was no camera for that item.  You asked me if I had any other

16     cameras.  I said no.  And then I remembered there is a camera

17     on the rifle, on the deer hunting rifle, and I showed you

18     that.  There is a deer hunting rifle that I have, and that

19     has -- that is equipped with a camera with cross hair on it."

20              That's your answer.

21     Q    Great.  May I ask you to go to line 18 and read that one?

22     A    Okay.

23     Q    May I ask you to read it aloud for us?

24     A    Right.  Okay.

25              Question:  "And is that what you said to me?"
```

1      Answer:  "That is the conversations which led up to

2   you wanting to inspect the rifle and the camera on it.  And

3   now I don't know what would be the recording device which you

4   would record data on a deer hunting rifle or its cross hair,

5   but you want to inspect it.  You saw it."

6   Q    May I ask you to go to the next page, on Line No. 5,

7   please?

8   A    Are you going to skip the line where I respond to that,

9   that assertion?

10  Q    Feel free to read your own line, sir.

11  A    So in response to that statement by Mr. Bakhtiari, I

12  said:  "Well, first of all, I didn't open the box with the

13  item that had the camera.  You opened items to show us things

14  that were in certain containers you had; so let me just

15  correct that for the record.  Secondly, I didn't ask to see a

16  gun.  You said there was an item that you had a camera that

17  you might want to show to me, and then you retrieved that gun

18  or the gun that had what you described as cross hairs,

19  correct?"

20  Q    The answer is?

21  A    And then your answer is:  "No.  That is highly

22  inaccurate.  There were -- there are a group of boxes which

23  has -- have tools and electronic tools and some power tools in

24  them in my office.

25          "Counselor Glennon Fogarty requested his contractor

1   to open them one by one and go through them to make sure that

2   we are not leaving any electronic storage device out.  They

3   did so.  They did not find anything.  One of them looked like

4   a camera with an electronic device on it.  Counsel Fogarty

5   wanted to make sure if it had record data or not.  He

6   inspected that and told him there were no other camera.

7          "And he asked if I had any other cameras available.

8   And I just told them that there's a rifle with a camera on it,

9   but I don't think they record anything.  And then that was

10  followed up by the rifle being inspected."

11  Q    May I ask you to keep reading?

12  A    Question by Fogarty:  "Does the rifle have a camera on

13  it?"

14         Answer:  "It has a cross hair.  And the cross hair is

15  instituted within a camera."

16         Question by Fogarty:  "Can you record information?"

17         Answer:  "That was my point, that there is no

18  capacity on those rifles to record what the cross hair is

19  seeing.  There may be some other weapons, but mine doesn't."

20  Q    And so you are really saying that -- maybe would you help

21  us out with one more paragraph?

22  A    Oh.  Question:  "So you are really saying that the rifle

23  has a scope that's a magnifier as opposed to a camera?"

24         Answer by Bakhtiari:  "All rifles, all cross-hair

25  scopes have magnification capacities to them.  That's one of

1      the purposes of that being there."

2            Question:  "But it doesn't have a camera aspect to

3      it, does it?"

4            Answer by Bakhtiari:  "Define 'camera.' If a camera

5      which is a tool which enhances your vision.  Now, not all

6      cameras are recorders.  Now, like I have another night-vision

7      camera that you inspected, the infrared night-vision camera.

8      That doesn't record, but that enhances the vision."

9            MR. BAKHTIARI:  Thank you.  Your Honor, back then, in

10     January 18, I maintained the same thing.  The rifle was

11     produced at the request of Mr. Fogarty and his consultant to

12     inspect if it records digital data.

13           THE COURT:  You'll have the chance to argue later.

14           MR. BAKHTIARI:  Thank you, Your Honor.

15           THE COURT:  You may step down, sir.  You may step

16     down.

17           Did you have a question for your --

18           MR. SAUER:  Did you -- you were also a victim in this

19     case.  Did you wish to address the Court on that issue?

20           THE WITNESS:  If it's permissible.

21           THE COURT:  Yes.

22           THE WITNESS:  Your Honor, this event was gravely

23     disturbing when it only affected Mr. Hiles and I was very

24     concerned for Mr. Hiles.  But when it escalated several days

25     later, it was obviously of even greater concern to me.

1       And I think it's been a big impact on me and my

2   family, and it has weighed terribly.  And as you have, in my

3   opinion, as we have seen today, there's been no apology, no

4   remorse, and I recommend that the most maximum sentence be

5   imposed and that restrictions be imposed on access to email or

6   internet.

7       THE COURT:  All right.  Thank you, sir.

8       We are going to take a ten-minute recess.

9       **(COURT RECESSED FROM 11:25 AM UNTIL 11:35 AM.)**

10      THE COURT:  Okay.  Ready to go.

11      MR. BAKHTIARI:  Your Honor, may I call a witness?

12      THE COURT:  Not out of turn, no.  I allowed you one

13  already, but that was because there was a schedule --

14      MR. BAKHTIARI:  I thought it was my turn.  My

15  apologies.

16      THE COURT:  No.  I need to hear on the record the

17  rest -- that the Government's resting.

18      MR. SAUER:  Yeah.  Judge, the Government has no

19  further witnesses to call at this time.  We had intended to

20  call Inspector Follmer, but I will rely on the sworn

21  admissions in the plea agreement for his testimony.

22      THE COURT:  Very well.

23      You may present your witnesses.

24      MR. BAKHTIARI:  Thank you, Your Honor.

25      THE COURT:  Good morning.  Please come forward, raise

```
 1    your right hand.

 2                    (WITNESS SWORN BY THE CLERK.)

 3           THE COURT:  You may inquire.

 4                         SHARON L. WEISS,

 5    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

 6    FOLLOWS:

 7                        DIRECT EXAMINATION

 8    BY MR. BAKHTIARI:

 9    Q    Good morning, Ms. Weiss.

10    A    Good morning.

11    Q    When was the first time, roughly, when you and I met?

12    A    July 2011.

13    Q    What was the context of our meeting, and what format did

14    we meet?

15    A    My daughter.

16           THE COURT:  Would you get right up to the microphone,

17    please?

18    A    My daughter was dating you.

19    Q    Back in the summer of 2011, did your daughter and I move

20    in together and start living together?

21    A    Yes.

22    Q    Is your daughter's name Laura?

23    A    Yes.

24    Q    Did we become engaged last year?

25    A    Yes.
```

1    Q      Do you recall a Sunday happening to be January 15 of

2    2011 -- 2012, January 15 of 2012, this year, a Sunday, did me

3    and some other people have dinner at your house that night?

4    A      You did.

5    Q      Who were the people who had dinner at your house that

6    night?

7    A      It was you and Laura and Ali Mir.

8    Q      Who is Ali Mir?

9    A      He's a friend of yours and Laura's.

10   Q      Did we share with you about what we did throughout the

11   day that day?  Did you hear from either of those parties?

12   A      Yes.

13   Q      What was it that we attended that day?

14          MR. SAUER:  Objection.  Calls for hearsay.

15          THE COURT:  No -- okay.  Who is telling you what they

16   did?

17          MR. BAKHTIARI:  Your Honor, this is an exception to

18   the hearsay because Ms. Weiss was a part of that conversation,

19   and she was the part of the events throughout that day with

20   us.

21          THE COURT:  All right.  Okay.  As long as it's in her

22   presence.  Overruled.

23   Q      (BY MR. BAKHTIARI) Yes, Your Honor.

24          Did you hear from -- did you find knowledge of what

25   we did throughout the day, morning and afternoon, of that

1    Sunday?

2    A    Yes.  You went -- you all had went to a Cardinal party,

3    and I had been after you guys to come and eat dinner with us,

4    and you came and ate dinner with us.

5    Q    So what time was it, roughly, that we came to your house

6    for dinner?

7    A    Like four or five, something like that, in the evening.

8    Q    Did we stay after dinner at your house?

9    A    Yes.

10   Q    Roughly until what time?

11   A    Probably 11:30, 12:00.

12   Q    Do you recall if I left your house or excused myself from

13   the table for a long period or --

14   A    No.

15   Q    Did I left the premises of your house?

16   A    No, you did not.

17   Q    Where is your house located?

18   A    It's in Festus, Missouri, outside of the city limits of

19   Festus.

20   Q    Are you between -- is that fair to say you're between

21   Festus and De Soto?

22   A    Yes, yes.

23   Q    Ms. Weiss, I have an exhibit.  Is that the picture of the

24   wedding from between me and your daughter?

25   A    Yes, it is.

1  Q    Did I marry your daughter?

2  A    Yes, you did.

3  Q    Was that on March 31 of this year?

4  A    Yes.

5  Q    Were we engaged about a year prior to that?

6  A    Probably.

7  Q    Am I the sole provider for your daughter?

8  A    Yes, you are.

9  Q    Does your daughter suffer from lupus?

10  A    Yes, she does.

11  Q    When we were engaged back in 2011, and earlier in 2012,

12  did I convey to you that I had health insurance and my

13  intention was to care for my new bride?

14  A    Yes.

15        MR. SAUER:  Objection, calls for self-serving hearsay

16  statement of the defendant himself.

17        THE COURT:  Yeah, I think it does.  Overruled.  I

18  will hear it.

19  Q    Did I lose health insurance sometime by March or April,

20  as best of your knowledge?

21  A    Yes.

22        MR. SAUER:  Objection.

23  Q    That I told you of?

24  A    Yes.

25        MR. BAKHTIARI:  Your Honor, I'm asking for her

1    knowledge.  I'm not asking for what she's heard.

2            THE COURT:  I haven't heard the objection yet.

3            MR. SAUER:  I was going to object on the personal

4    grounds of hearsay because it's pretty clear that the form of

5    the question was:  Did I tell you such and such?  Her response

6    will just be repeating back what the defendant has told to

7    her.  That's a self-serving prior statement of the defendant

8    as used to buttress his own credibility and not subject

9    himself to cross-examination.

10           I also object on the grounds of relevance.  I don't

11   see how any of this is relevant to any of the enhancements.

12           MR. BAKHTIARI:  Your Honor, we are speaking --

13           THE COURT:  I will -- the objection is sound.  I will

14   overrule it, however, and let you proceed.  Go ahead.

15           MR. BAKHTIARI:  Thank you, Your Honor, because this

16   witness is speaking --

17           THE COURT:  I'm letting you proceed.  Go ahead.

18   Q    (BY MR. BAKHTIARI) Ma'am, as the mother of Laura Weiss,

19   did you take a dutiful approach to make sure she'll have

20   health insurance when she is married?

21   A    Yes.

22   Q    So she made -- you made your own finding as to if they

23   were going to have health insurance while married or not?

24   A    Yes.

25   Q    Are you aware if I am supporting small children?

 1    A     Yes.

 2    Q     If you flip those pages, second and third page, are those

 3    children that I support?

 4    A     Yes.

 5    Q     Based on your knowledge and your findings, am I the sole

 6    supporter of those children?

 7    A     Yes.

 8    Q     Based on your knowledge and your findings and your

 9    experience with your daughter, is she able to live on her own

10    without me?

11    A     No.

12    Q     Are those children able to be supported and live on their

13    own without me?

14    A     No.

15    Q     Has your daughter exhibited her opinions about her

16    current marriage?  Is she happy?

17    A     She is very happy.

18    Q     Do you know why she doesn't say to me directly sometimes?

19    A     Do what?

20          MR. BAKHTIARI:  I withdraw that question, Your Honor.

21    Your Honor, I'm done with this witness.  Thank you.

22          THE COURT:  Any questions?

23          MR. SAUER:  Very briefly.

24                         **CROSS-EXAMINATION**

25    **BY MR. SAUER:**

1   Q    Ms. Weiss, you care deeply about your daughter, I

2   presume?

3   A    Yes.

4   Q    And you care about her welfare?

5   A    Of course.

6   Q    And you don't want to see Mr. Bakhtiari go to prison

7   because it could affect your daughter's welfare; is that

8   correct?

9   A    Yes.

10  Q    You testified that he and Mr. Mir attended dinner at your

11  house on January 15 of 2012?

12  A    Yes.

13  Q    How do you know it was that exact date?

14  A    You know, I knew you would ask me that, and the reason

15  being, I'm a teacher's aide, and I was off school the next

16  day.  So them staying late didn't bother me because I knew I

17  didn't have to work the next day.  That's the only reason I

18  remembered that.

19  Q    How do you know it wasn't a Saturday evening as opposed

20  to a Sunday evening?

21  A    Because I remembered them saying they didn't go to church

22  that day and later that they went -- had went to a Cardinal

23  party.  That's the only reason why.

24  Q    How do you know it wasn't the three-day weekend that

25  falls in February as opposed to January?

1    A    Because I just remember it, Martin Luther King's

2    birthday.

3    Q    Did you discuss your testimony with Mr. Bakhtiari before

4    you came to testify today?

5    A    No.

6    Q    So he never suggested to you that it was the 15th of

7    January as opposed to some other day?

8    A    No, no.

9         MR. SAUER:  That's all I have, Judge.

10        THE COURT:  All right.  You may step down.  You are

11   excused, ma'am.

12        You may call your next witness.

13        MR. BAKHTIARI:  Yes, Your Honor.

14                **(WITNESS SWORN BY THE CLERK.)**

15        MR. BAKHTIARI:  Your Honor, may I clarify that this

16   witness will speak only to the sentencing factors listed under

17   18 U.S.C. 3553(a) and to the background, career, and character

18   of the defendant, which would be me.

19                  **MICHAEL  GREGORY  SALAZAR,**

20   **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

21   **FOLLOWS:**

22                    **DIRECT EXAMINATION**

23   **BY MR. BAKHTIARI:**

24   Q    Mr. Salazar, good morning to you.

25   A    Good morning.

1   Q    When was the first time when you and I met?

2   A    Oh, approximately two and a half to three years ago.

3   Q    Did you ask me, upon meeting, to join your evangelistic

4   team?

5   A    Shortly thereafter, yes.

6   Q    Is that fair to say that I served both as the IT person

7   and also as an evangelist in your ministry?

8   A    Yes, it is.

9   Q    Did you and I travel together for evangelistic purposes?

10   A    Yes.

11   Q    Last year, in 2011, did we speak in a few places in

12   Missouri, a few churches?

13   A    Yes, we did.

14   Q    In January and February of this year, did you and I

15   travel to a few churches in the states of Georgia and Florida?

16   A    In January?  Yes.  And at the end of December as well.

17   Q    And did we go to states of Georgia and Florida?

18   A    Yes.

19   Q    What were the purposes of these trips?

20   A    Evangelistic missions and to reach the lost.

21   Q    How many years have you been a pastor, sir?

22   A    Approximately twenty.

23   Q    Have you heard that for some reason or another some

24   Muslim nations sometimes issued fatwas?

25   A    Yes, I have.

1    Q    When you invited me to join your team, were you worried

2    about any fatwa issues?

3    A    No.

4    Q    Did you suspect that it may come up like in a complaint

5    or objection at some time by the Muslim nations?

6    A    Possibly.

7    Q    Did those churches, did they broadcast our evangelistic

8    speeches on the internet?

9    A    Yes, they did.

10   Q    Specifically, did the church in Daytona, Florida, did

11   they broadcast it live internationally?

12   A    Yes.

13   Q    Mr. Salazar, did you receive that letter to your

14   residence in your house?

15   A    Yes.

16   Q    May I first point your attention to the last page from

17   the bottom.  If you flip through the very last page, is that

18   the tracking list -- is that the DHL tracking list?

19   A    Yes.

20   Q    From the very bottom line, is that letter issued from --

21   is that letter coming from Tehran, Iran?

22   A    Yes.

23   Q    May I ask you to read back to the first page, and may I

24   ask you to please read that?

25            THE COURT:  I can see it.  Is this it?

1          MR. BAKHTIARI:  Yes, Your Honor.

2          THE COURT:  I can read it.

3          MR. BAKHTIARI:  Thank you, Your Honor.  My apologies.

4          THE COURT:  Let me read it.  Just a minute.  Let me

5    read it.

6          MR. BAKHTIARI:  Yes, Your Honor.

7          THE COURT:  Okay.  Go ahead.

8    Q    (BY MR. BAKHTIARI) Mr. Salazar, after you received that

9    letter, did you immediately call me on the phone?

10   A    Yes.

11   Q    Did you read this letter to me?

12   A    Yes.

13   Q    Did I ask you immediately to dismiss me from duties in

14   your team?

15   A    Yes.

16   Q    Did you later on, through the phone conversation,

17   convince me to stay or reconsider?

18   A    Yes.

19   Q    Did we meet in person afterwards?

20   A    Yes.

21   Q    Was your perception that I was fearful?  Did you perceive

22   me as a man who was scared at the time?

23   A    Yes.

24   Q    Did you and I -- did you and I get a visit from FBI

25   agents about this issue?

Case: 4:12-cr-00097-ERW   Doc. #:  139   Filed: 12/10/12   Page: 106 of 162 PageID #: 884

1    A    Yes.

2    Q    Do you know if it's still under investigation?

3    A    No.

4    Q    Now --

5    A    I don't know.

6    Q    You don't know.

7         Your Honor, there is a video clip, which is one

8    minute, that is an exhibit associated with this witness.  May

9    I play that?

10        THE COURT:  Sure.  Will you assist him with that?

11        THE CLERK:  He has it hooked up.

12        THE COURT:  Okay.

13        MR. BAKHTIARI:  May I proceed, Your Honor?

14        THE COURT:  Yes.

15                   **(VIDEO CLIP PLAYED.)**

16        MR. SAUER:  Judge, I'd renew my objection, not as to

17   the playing of this, but as to any reliance on it by the Court

18   as a submission of the defendant's own self-serving hearsay

19   prior statements.

20        THE COURT:  All right.

21   Q    (BY MR. BAKHTIARI) Mr. Salazar, did those investigators do

22   their own independent investigation into the matter, the

23   reporters that you just saw on the clip?

24   A    I believe so.

25   Q    Did they take our own word for it, or did they do their

1    own independent work on the whole story?

2    A    I believe they did some independent work.

3    Q    Mr. Salazar, did we get a reaction from the Muslim

4    community of St. Louis after this clip was broadcasted?

5    A    No.

6    Q    Mr. Salazar, did you have a major surgery on your leg

7    recently?

8    A    Yes.

9    Q    Is that why the ministry is on hold for a few months that

10   we've had from traveling?

11   A    Yes.

12        MR. BAKHTIARI:  I have to load another exhibit.  It's

13   a website.  It's not a video clip, Your Honor.  If I may?

14        THE COURT:  All right.

15        MR. BAKHTIARI:  Because we don't have access to the

16   internet here, Your Honor, I would forgo that website.  I will

17   just simply ask the witness a question.

18        THE COURT:  All right.

19   Q    (BY MR. BAKHTIARI) Mr. Salazar, does your ministry have a

20   branch in Kansas City?

21   A    Yes.

22   Q    And who leads that branch?

23   A    You do.

24   Q    What are the activities that that branch does?

25   A    Doing evangelistic work in the outdoors, reaching out to

1  people.  Also serving meals, I believe that's every Thursday,

2  to the needy and the homeless.

3  Q    Who is the head chef for that mobile soup kitchen?

4  A    I'm not sure if it's you or your wife.

5  Q    And do you recall that you and I have had disagreements

6  about different things while traveling together?

7  A    Yes.

8  Q    Did we reason or did I come across violence to you at the

9  point of disagreement?

10  A    Never any violence.

11  Q    Does our evangelistic work, does that include

12  interpersonal interactions with different people from

13  different walks of life?  Is that fair to say?

14  A    Yes.

15  Q    Are you happy with the interactions that you see between

16  me and your audience?

17  A    Yes.

18  Q    Do you lead the evangelistic team?  Are you the leader?

19  Are you the lead evangelist in our team?

20  A    No.

21  Q    Who is the lead in our team?

22  A    You are.

23  Q    And if you see any -- if you see any downfalls or any

24  negativities, would you address that?

25  A    Yes.

```
1          MR. BAKHTIARI:  I have no further questions for Mr.

2    Salazar, Your Honor.

3          THE COURT:  All right.  Questions?

4          MR. SAUER:  Briefly, Your Honor.
```

**CROSS-EXAMINATION**

**BY MR. SAUER:**

```
7    Q    Pastor Salazar, what independent investigation did the

8    news reporters do other than take the word of yourself and Mr.

9    Bakhtiari that you -- you, in fact, did receive that letter,

10   right?

11   A    Yes.

12   Q    It was a DHL package; is that correct?

13   A    Yes.

14   Q    And you reported it to the news station, or Mr. Bakhtiari

15   reported it to the news station?

16   A    I'm not sure how they found out.

17   Q    What independent investigation did they do other than

18   interviewing yourself and Mr. Bakhtiari?

19   A    Well, even for the sound bites, you heard that they went

20   and they talked to a mosque out in West County.

21   Q    Did you hear them also say that the mosque just didn't

22   give them any response at all?

23   A    I believe that later they did.

24   Q    But at the time they were reporting that, they said the

25   mosque didn't give them any response?
```

1   A    At that particular moment, no.

2   Q    So other than contacting a mosque who didn't respond, are

3   you aware of them doing any other investigation?

4   A    Yes.  I'm --

5   Q    What did they do?

6   A    I believe I was told -- as a matter of fact, I know I was

7   told that they did contact the mosque in question in West

8   County and that they brought forth a news -- you know, a

9   report of their own.

10  Q    I'm sorry.  At the time of the news clip --

11       THE COURT:  Wait, wait, wait, wait.  Wait until the

12  question before you answer.

13  Q    At the time of the news clip that was just played, are

14  you aware of those reporters receiving any substantive

15  information about this issue other than what yourself and Mr.

16  Bakhtiari had reported to them?

17  A    No.

18  Q    You were interviewed -- you also reported this to the

19  FBI; is that correct?

20  A    Yes.

21  Q    And an FBI agent came and interviewed you; is that

22  correct?

23  A    Yes.

24  Q    And at the time -- you were aware at the time this fatwa

25  arrived that Mr. Bakhtiari was already under indictment for

1    sending the threatening email to Brad Hiles; is that correct?

2    A    No.

3    Q    You were aware that he was under indictment, though,

4    weren't you?

5    A    Yes.

6    Q    Did you know the particulars of that indictment?

7    A    No.

8    Q    Did you know that it was an indictment for obstruction of

9    justice?

10   A    No.

11   Q    But were you generally aware that he had federal charges

12   pending at the time?

13   A    Yes.

14   Q    In the course of the interview with the FBI, Mr.

15   Bakhtiari provided information about this purported fatwa; is

16   that correct?

17   A    Yes.

18   Q    But he did not tell the FBI agent that he was currently

19   under federal indictment at that time, did he?

20   A    I don't recall.

21   Q    Do you recall after Mr. Bakhtiari -- outside the presence

22   of Mr. Bakhtiari, do you recall plucking the sleeve of the FBI

23   agent and telling him, Hey, I just want to let you know Mr.

24   Bakhtiari didn't say so, but you advised the FBI that he was

25   under the federal indictment.  Do you recall doing that?

1    A    No.

2    Q    Were you aware that Mr. Bakhtiari sent me an email the

3    day after this supposed fatwa arrived demanding that he be

4    given probation in his case because of the fatwa?

5    A    No.

6    Q    Were you aware that the FBI conducted an investigation of

7    this fatwa and deemed it to be wholly noncredible?

8    A    No.

9    Q    Were you aware that the FBI suspected or believed that

10   Mr. Bakhtiari had arranged for this to be sent by himself?

11   A    No.

12         MR. SAUER:  No further questions, Your Honor.

13         MR. BAKHTIARI:  May I, Your Honor?  I have to

14   redirect a few things.

15         THE COURT:  All right.

16                    **REDIRECT EXAMINATION**

17   **BY MR. BAKHTIARI:**

18   Q    Mr. Salazar, are you aware if the FBI agent and I had

19   phone conversations individually, one-on-one, before and after

20   that meeting?

21   A    No.

22   Q    Do you recall -- because if you were not a part of those

23   conversations, so you do not know if I disclosed anything

24   about these charges to them or not; is that correct?

25   A    Correct.

1   Q    Mr. Salazar, were you and I involved in the evangelism

2   years prior to the March of 2012?  Were you and I doing this

3   evangelistic work --

4   A    No.

5   Q    -- years prior?  A year prior to the --

6   A    We started in, I believe, 2010 and '11.

7   Q    2010 and '11?

8   A    Yes.  It ended --

9   Q    Is that several months prior?

10          THE COURT:  Wait, wait, wait.  You know, we just

11   can't have two people talking at the same time.

12   Q    Yes, Your Honor.  That is my fault.  And my apologies.

13          You and I started in 2010 doing this evangelistic

14   work?

15   A    I believe so, yes.

16   Q    Where I was -- based on your knowledge, was I indicted

17   back then?

18   A    I didn't know anything about that back then.

19   Q    Based on your knowledge, these types of evangelistic

20   works which are done by Muslim converts, are they bound to

21   attract fatwas sooner or later, based on your experience?

22   A    Yes.

23   Q    Based on your experience and knowledge, are there

24   evangelists who are in death row sitting in Iran?

25   A    Yes.

1    Q    Do you know if there are Muslim converts to

2    Christianities?

3    A    Yes.

4    Q    Do you know if either of them are indicted by Mr. Sauer?

5          THE COURT:  Wait, wait, wait.

6          MR. SAUER:  Judge, I'm going to object about his

7    testifying as to what the state of evangelists in Iran is.  He

8    obviously has no personal knowledge.  He's not an expert.

9          THE COURT:  Right.  Yeah.  Well, it's already in, but

10    let's get the record straight.  That's the important thing.

11    Where do you need to pick up, Ms. White?

12    **(THE REPORTER READ BACK THE PORTION OF THE LAST QUESTION.)**

13          THE COURT:  All right.  Ask a new question.

14    Q    Do you know if either of those evangelists are right now

15    opposing Mr. Sauer in any lawsuits?

16          MR. SAUER:  Objection.

17    A    No.

18          MR. BAKHTIARI:  Thank you, Your Honor.  I have no

19    further questions for Mr. Salazar.

20          THE COURT:  You are excused.

21          MR. BAKHTIARI:  Your Honor, if I may, I have a video

22    clip which is another one minute that speaks to my cooperation

23    with the law enforcement, just to play for the Court.  And

24    then there is a Mr. -- my understanding was it is customary

25    that defendant's friends and relatives speak to the Court

1    prior to the defendant being sentenced.

2           There is a short letter Mr. Salazar wants to read to

3    the Court, and there is a short letter that my wife wants to

4    read to the Court.  There is a short letter that the guardian

5    of my children as an affidavit of fact is read into the court.

6    These are very brief.  Each one of them is like one minute.

7    And then I believe we are done.

8           THE COURT:  All right.

9           MR. SAUER:  Judge, I don't object to written letters

10   on behalf of defendant being submitted.  I do object to

11   persons other than the defendant addressing the Court by way

12   of allocution.  I think they would be required to take the

13   stand and testify.  If they want to submit like a letter and

14   that's all, there's no need for that to be read aloud.  They

15   can just be submitted to the Court.  But to the extent they

16   want to speak to the Court, I think they have to be placed

17   under oath.

18          MR. BAKHTIARI:  Your Honor, could we keep Mr. Salazar

19   under oath so he can read his letter to the Court under oath?

20          THE COURT:  No.  If you'll just give me the letters,

21   I will read -- I can read the letters, okay?

22          MR. BAKHTIARI:  Yes, Your Honor.  Definitely so.  I

23   will simply play the video and then proceed by my closing

24   argument.

25          THE COURT:  All right.

1          MR. BAKHTIARI:  Thank you.

2          MR. SAUER:  Judge, I'm not sure what this video is,

3    but if it is what I believe, I will just note my objection.

4          THE COURT:  Wait.  A little slower, Mr. Sauer, and at

5    the microphone.

6          MR. SAUER:  Judge, Mr. Bakhtiari hasn't shared with

7    me what's on this video, but based on his characterization, I

8    suspect it's full of irrelevant materials and hearsay.  So I

9    object to its consideration, but I don't object to it being

10   played.

11         THE COURT:  If it's one minute, I'll hear it, and

12   then I can sort it out.  Overruled.

13                    **(VIDEO CLIP PLAYED.)**

14         THE COURT:  Okay.  Now, I want to make sure I

15   understood what I just saw.  You're putting this on to

16   demonstrate you are a --

17         MR. BAKHTIARI:  Your Honor --

18         THE COURT:  -- intellectual technical person?

19         MR. BAKHTIARI:  I am a volunteer cyber forensics

20   expert for St. Louis County Police.  This is one of the many

21   cases that we have done.  For example, for this case --

22         THE COURT:  Okay.  I got it.  I got it.  Thank you.

23   All right.  Do you have your letters?

24         MR. BAKHTIARI:  Yes, Your Honor.  Your Honor, these

25   have been already submitted to the Court with my objections to

1    PSR.  Mr. Sauer has his copies, and I believe the Court does,

2    but just to make sure, I have separated them and resubmit them

3    to the Court herewith.

4         THE COURT:  All right.  Now, if you want -- I don't

5    want the persons you mentioned to read them.  I can read them

6    myself.  If you want them to testify, then I will hear their

7    testimony.

8         MR. BAKHTIARI:  Your Honor, the grandmother of

9    children who is a partial guardian, she is ill, so she has

10   submitted an affidavit of facts under oath.

11        THE COURT:  All right.

12        MR. BAKHTIARI:  And the rest of them are not

13   authenticated with affidavits, and they just -- it was their

14   understanding that defendant's relatives could speak to the

15   Court.

16        THE COURT:  And they can, but I can read their

17   letters.  I don't need to --

18        MR. BAKHTIARI:  Yes, Your Honor.  That would suffice

19   for me.  If I may, Your Honor, if the Court would allow me, I

20   have a one-minute statement directed at the Hiles family and

21   one or two minutes closing arguments, and then we are done.

22        THE COURT:  Well, we will get to that eventually, and

23   these letters, we will get to those, but first of all, I have

24   to make rulings on the United States Sentencing Guidelines,

25   and then I will have allocution.

1        I have pulled the plea agreement because there are

2   some things about your evidence that suggest to me that you

3   are trying to convince me contrary to what you pled guilty to,

4   and if that happens, then I have to take away your points for

5   acceptance of responsibility.

6        I have read the statement of facts to which you agree

7   by signing the agreement, and I specifically asked you during

8   the plea colloquy if you had any disagreement with the facts

9   recited in the record by Mr. Sauer, and there were none.

10       So are you -- I just need to know, are you now saying

11   that these facts are not correct?

12       MR. BAKHTIARI:  Your Honor, every single word that

13   that affidavit -- that that plea document says, I have done.

14   Whatever it doesn't say, I have not done.

15       Your Honor, I came to the court today and I brought

16   my jackets with me.  If I turn around and say, I caused my

17   jacket to be brought to the court, that that raises more

18   questions than answers.

19       Mr. Sauer said to me, said to Ms. Smith, and wrote to

20   this Honorable Court in large print, that his priority lies in

21   his racketeering cases that are high-profile cases.  He rushed

22   through drafting that statement.  It is the law of the Eighth

23   Circuit, Your Honor, that that plea agreement is in jeopardy

24   in the light favorable to defendant because the Government

25   drafted --

1           THE COURT:  Wait, wait.  Now --

2           MR. BAKHTIARI:  Your Honor, I have --

3           THE COURT:  Wait, wait, wait.  Now, wait a minute.

4           MR. BAKHTIARI:  Yes, please.

5           THE COURT:  Answer my question.  Are you now saying

6    these facts are not the facts you agreed to, and you want --

7    you do not want me to accept these facts?

8           MR. BAKHTIARI:  Please accept them, Your Honor.  They

9    are all true.

10          THE COURT:  All right.  Now, you may sit down.

11          MR. BAKHTIARI:  Thank you, Your Honor.

12          THE COURT:  I have read the -- obviously, I had read

13   the presentence report.  I have read all of the memorandums

14   filed on behalf of both parties.  I have read the cases which

15   I have here and have cited -- that are cited by the defendant.

16   I heard evidence, and I shall now make calculations under the

17   United States Sentencing Guidelines.

18          The 2012 guideline manual was used to determine the

19   defendant's offense level under United States Sentencing

20   Guideline 1B1.11.  Count 2, obstruction of an official

21   proceedings.  The base offense level for violation of 18,

22   United States Code, 1512(c)(2) is found in United States

23   Sentencing Guidelines Section 2G1.2(a) of the manual.  The

24   base offense level is 14 under 2J1.2.

25          Specific offense characteristics.  As the offense

1    involved threatening to cause physical injury to a person in

2    order to obstruct the administration of justice, eight levels

3    are added under United States Sentencing Guideline

4    2J1.2(b)(1)(B).

5              I have heard substantial evidence.  In this regard I

6    am convinced more than a preponderance of the evidence, but

7    the evidence is clear and convincing that the defendant did,

8    in fact, threaten or cause physical injury to a person, and it

9    happened in the form of sending a threatening or sending the

10   email and then the follow-up presentation of a loaded rifle

11   with the scope and cross hairs on the rifle to the victim's

12   law partner.  And my belief is that was done to demonstrate

13   that the defendant had the ability to inflict serious harm

14   against not only the defendant -- not only the victim, but his

15   wife, his son, his daughter-in-law.

16             He went to great extent to take photographs of

17   wedding photographs and place cross hairs on the foreheads of

18   the daughter-in-law and of the son of Mr. Hiles.  And this

19   clearly satisfies the requirements of 2J1.2(b)(1)(B).

20             The next is, as to the offense was extensive in

21   scope, planning, and preparation, two levels are added under

22   2J1.2(b)(3)(C).  In this case the defendant went to

23   extraordinary efforts to get -- locate Mr. Hiles' residence,

24   sent pictures of the residence, sent pictures of the recent

25   daughter-in-law and son with cross hairs on their forehead,

1   obviously taking a lot of planning, preparation to present

2   those menacing photographs.

3           The individuals of Hiles, the entire family, the

4   Fogarty family have suffered severely from these actions of

5   the defendant.  Two levels are justified under 2J1.2(b)(3)(C).

6           There is a obstruction of justice in paragraph --

7   enhancement under paragraph 28.  I need to have your further

8   explanation.  I'm not so convinced about paragraph 28.  I'd

9   like to hear first from you, Mr. Sauer, as to why you believe

10  there should be an additional two-level enhancement.

11          MR. SAUER:  Yes, Your Honor.  Your Honor, in this

12  case the probation office in the disclosure presentence

13  investigation report recommended a further enhancement for

14  obstruction of justice on the ground that the defendant, once

15  he was under indictment, eight weeks after he was indicted,

16  submitted false affidavits to the U.S. Attorney's office and

17  attempted to file them with the court, falsely claiming that

18  the postal inspectors, when they had arrested him and

19  conducted a search warrant on his house, had subjected himself

20  and his wife to, quote, torture and sexual abuse, including

21  shackling them naked to furniture and subjecting them to

22  various abusive behaviors in the course of that.

23          These allegations, when I received them, were

24  appalling to me.  They were unsettling, deeply unsettling to

25  the honest and decent agents that were involved in this, and I

1   immediately knew them -- believed them to be false and that my

2   belief was probably confirmed by the fact that there were

3   photographs taken in the course of the search warrant that

4   were directly inconsistent with those claims.

5           In the course of negotiations with Mrs. Smith or Ms.

6   Smith, Andrea Smith over the summer, I offered -- made a very

7   generous, I think, plea offer to the defendant that he would

8   not be prosecuted for perjury and obstruction of justice on

9   the basis of those allegations if he would admit that they

10  were knowingly false.  He did so in the plea agreement.  The

11  plea agreement is very explicit on this point.

12          And at that time, I forwent in negotiating the plea

13  agreement the opportunity to seek an enhancement for

14  obstruction of justice on the basis of those particular

15  actions.

16          However, as I've set forth in my sentencing

17  memorandum, the plea agreement also specifies that if the

18  defendant submits false information, intentionally provides

19  misleading, incomplete, or untruthful information to the

20  probation office, and so forth, or commits any crime, the

21  Government may, in its discretion, proceed with a request for

22  the enhancement of the obstruction of justice.

23          I've set forth in my sentencing memorandum on pages

24  17 to 19 my belief that the defendant has violated the terms

25  of the plea agreement by repeatedly taking positions both in

1    private correspondence and threats of litigation against the

2    Post Dispatch in filings with this court and now in open court

3    here today, taking positions that are manifestly contrary to

4    his sworn statement of facts that he agreed in the course of

5    the plea agreement.

6          This, to my mind and I think on the plain terms of

7    paragraph 11 of the plea agreement, constitutes a breach of

8    the plea agreement that permits the Government may, in its

9    discretion, proceed with the agreement and may advocate for

10   any sentencing position supported by facts including, but not

11   limited to, obstruction of justice and denial of acceptance of

12   responsibility.

13         So as a basis for the two-level enhancement for

14   obstruction of justice, I would offer two general grounds.

15   First, the affidavits, the false affidavits accusing federal

16   agents of torture and sexual abuse that were submitted to the

17   U.S. Attorney's office and that were attempted to be submitted

18   to the court and that the defendant has now admitted in his

19   plea colloquy were -- the allegations were false and that he

20   made those allegations for the sole purpose of attempting to

21   retaliate against the federal officers and for the purpose of

22   corruptly influencing the proceedings in this criminal case.

23   So that basis is alone sufficient to satisfy the obstruction

24   of justice enhancement.

25         However, I've also set forth in significant detail on

1   pages 17 to 19 an alternative basis for those two levels for

2   obstruction of justice, which consists of the various

3   statements of false information that the defendant has

4   submitted to the court in preparation for this sentencing

5   proceeding.  And in particular, I would direct to the Court's

6   attention to setting forth in our sentencing memorandum how

7   all the representations he's made have been directly contrary

8   to the plea agreement.

9           The bottom line, Judge, is that the defendant wants

10  the benefit of a plea bargain, that is, the reduction of

11  sentence, without the cost of a plea bargain, which is

12  admitting that you did the crime and taking responsibility for

13  it.  He has persistently throughout the course of this

14  morning, throughout the course of his voluminous filings in

15  this court, persistently failed to accept responsibility for

16  actually threatening Brad Hiles, threatening Brad Hiles'

17  family, threatening Mr. Fogarty.

18          Within the last two hours, we have heard extensive

19  implication and argument from the defendant that he didn't

20  even know that email was being sent.  He's taken the same

21  positions in his papers before the Court.  The problem is, in

22  order to plead --

23          THE COURT:  Slow down, please.

24          MR. SAUER:  I apologize, Judge.  The problem with

25  that position is that he's taken a directly contrary position

1  in the plea agreement of which he still wants the benefit, and

2  yet he will not accept responsibility for his actions.

3          So I would offer to the Court two alternative bases,

4  each independently sufficient, for the two-level enhancement

5  for obstruction of justice:  The affidavits accusing Mr.

6  Follmer and the other agents of torture and sexual abuse, as

7  well as the false statements that he's made in his -- in

8  relation to this particular sentencing hearing.

9          Thank you, Your Honor.

10          THE COURT:  All right.  You may respond, if you care

11  to.

12          MR. BAKHTIARI:  Thank you, Your Honor.  In regards to

13  the -- in regarding the two-level downward variance, Your

14  Honor, as I mentioned before this Court today, I stand behind

15  every single word of the plea agreement.  Whatever it says, I

16  have done.  It says I, as a minor contributor, contributed to

17  that email coming about.  I have shamefully conceded to that,

18  and I do not dispute that.

19          The publications of the letter do not portray the

20  plea agreement as it was, and it exaggerates them.  I wrote to

21  them.  I asked them to redact it.  That underlines the premise

22  of what the Government is advocating for.  I followed the due

23  process for that.

24          I -- the Eighth Circuit says the timing and the

25  nature of the defendant's obstructive conduct, the degree of

1   his acceptance of responsibility, whether his obstruction of

2   justice was an isolated and early incident, whether he

3   voluntarily terminated his obstructive conduct, whether he

4   admitted and recanted his obstructive conduct, whether he

5   assisted in the investigation and his others offenses.

6            There is no magic formula.  And this is the

7   Stoltenberg law, basically, which is the law of the Eighth

8   Circuit.  Your Honor, listing those Stoltenberg factors here,

9   I -- if the language of the plea deal, plea agreement is not

10  clear, well, I don't know what to adhere to.  I admitted that

11  I, as a minor contributor, contributed to the email being

12  sent.  The Government itself has conceded they don't know who.

13  They don't know how.  They don't know what steps were taken.

14           THE COURT:  Well, it goes beyond that.  I've heard

15  evidence about, you know, you using the word "cunt," about

16  using the word "dear" in the presence --

17           MR. BAKHTIARI:  Yes, Your Honor.

18           THE COURT:  I mean, I'm convinced you sent the email.

19  I mean, that's just clear to me --

20           MR. BAKHTIARI:  I may have contributed to that, and I

21  shamefully accept that, Your Honor, and I have -- in my

22  pleadings I have said that many times, that I stand behind

23  every single word that the plea agreement says.

24           THE COURT:  Okay.

25           MR. BAKHTIARI:  But that language of that should be

1    clear to clear my conduct because the sentence is weighed

2    against the conduct, not against the intent, as the Court well

3    knows.  Furthermore --

4            THE COURT:  Wait.  I don't understand what you just

5    said.  Of course, intent has everything to do with it.

6            MR. BAKHTIARI:  Your Honor, but the court -- the

7    judicial courts do not punish a defendant for having bad

8    intent.  They punish a defendant for having, for --

9            THE COURT:  Conduct.

10           MR. BAKHTIARI:  For conduct.

11           THE COURT:  Right.

12           MR. BAKHTIARI:  Now, on several spots on that plea

13   agreement we have set -- I have conceded that, yes, bad

14   intent, I carried those at times, because I knew that the law

15   does not punish me for bad intent.

16           THE COURT:  All right.  Well, let's move on to

17   something else.  I'm not buying that.

18           MR. BAKHTIARI:  Yes, Your Honor.

19           THE COURT:  Secondly, do you admit that you told

20   agents that the police tied you up, handcuffed you, while you

21   were naked?  You admit that that's false?

22           MR. BAKHTIARI:  Your Honor, those actions happened

23   while I was arrested, but my wife and I were in two separate

24   rooms.  We could not exactly in person see the other.

25   Attorney Smith told me that there is a lot of room for error.

1        THE COURT:  Well, wait.

2        MR. BAKHTIARI:  I proposed that motion, and then I

3   redacted it.  If it's not been filed with the court, it is not

4   before the court.

5        THE COURT:  No, no.  Wait, wait.  Did you make the

6   false statement that you and your wife were handcuffed

7   together when you were both naked?

8        MR. BAKHTIARI:  Your Honor, that statement may have

9   inaccuracy in it, but it's not right-out false.  My wife has

10  written in her letter to you that we were abused, and those

11  allegations to the majority of them are correct.  But because

12  they may have inaccuracies in them, I redacted my motion.  I

13  asked the clerk not to file it, and it was returned to me.

14       And Mr. Sauer should at least honor this motion that

15  I called and I went to great length; that the motions do not

16  come on file so the Court would not have the loss of time of

17  entertaining something that I knew they may have inaccuracies

18  in them.  And that is a two-level enhancement for obstruction

19  of justice, Your Honor.

20       And again, I have adhered to the language of the plea

21  agreement.  And if it's vague, then the law of the Eighth

22  Circuit interprets that to my favor.  And it is vague.

23       Mr. Sauer, if he agrees -- if he believes I sent

24  those letters, emails, he could say:  Bakhtiari sent the

25  email.  But he has put in there:  Bakhtiari caused the email

1    to be sent.  English is my third language, Your Honor, but I

2    think I understand it well enough to know if he believes I

3    have sent it, he could sent -- write in his plea agreement:

4    Bakhtiari sent the email; Bakhtiari made the threat.

5             THE COURT:  Well, you know, you just keep digging the

6    hole deeper.  I've heard enough.

7             MR. BAKHTIARI:  Thank you, Your Honor.

8             THE COURT:  For the Court to find obstruction of

9    justice under 3C1.1, the Court must make independent

10   evaluation to determine if defendant committed perjury when he

11   objected to the enhancement.  One of my concerns is, I do

12   intend to deny acceptance of responsibility under 3E1.1(a) and

13   (b).  And I believe that I am not going to make the

14   obstruction of justice under 3C1.1 finding.

15            I will cite a number of cases.  They are United

16   States v. Abdul-Aziz.  That's Eighth Circuit 2007 opinion.

17   United States v. Crobsy.  It's a Eighth Circuit 1996 opinion.

18   United States v. Gomez, Eighth Circuit '99 opinion.  And

19   United States v. Iverson, 1996 Eighth Circuit opinion.

20            My concern is that I have to find that the defendant

21   committed perjury.  I'm not persuaded based upon everything

22   I've heard, giving the defendant the benefit of inferences,

23   that he did.  So the enhancement for obstruction of justice

24   under 3C1.1 will not be granted.

25            The defendant has throughout this case denied --

1  strike that -- has demonstrated that he has not accepted

2  responsibility for his actions in this case, and therefore, I

3  am not allowing the three-level reduction either under

4  2A1.1(a) or 2E1.1(b) either -- I'm sorry -- 3E1.1(a) or

5  3E1.1(b).  The total offense level is 24.

6         Where is the probation officer?  What is the

7  guideline for total offense level of 24 and a criminal history

8  category of 1?

9         PROBATION OFFICER:  Judge, it would be 51 to 63

10 months.

11        THE COURT:  Pardon me?  51 to 63?

12        PROBATION OFFICER:  Correct.  And the fine range

13 would change from $10,000 to $100,000.

14        THE COURT:  Okay.

15        PROBATION OFFICER:  The term of supervised release

16 would remain the same.

17        THE COURT:  Three years, right.  Okay.  Thank you.

18        PROBATION OFFICER:  Correct.

19        THE COURT:  The Court finds that the United States

20 Sentencing Guideline range is from 51 months to 63 months.

21        At this time do you know of any reason why I should

22 not proceed to sentence you in this case?

23        MR. BAKHTIARI:  Your Honor, I have very few brief

24 points to make to convince the Court that I fall outside the

25 heartland and the purpose of the guidelines, and for that

1    purpose, to consider a sentence outside and beneath the

2    guideline, I have a few points to make very briefly.

3            THE COURT:  All right.

4            MR. BAKHTIARI:  Your Honor, the premise of this case

5    is that I have been litigious and then went beyond

6    litigiousness and attempted to basically refuge to violence.

7            THE COURT:  That's not what this charge is about at

8    all.

9            MR. BAKHTIARI:  Well, the obstruction of the justice,

10   Your Honor, using violence, or at least attempting to obstruct

11   justice using violence.  Well, the Court has its own finding.

12           THE COURT:  That's correct.

13           MR. BAKHTIARI:  Yes, Your Honor.  And as we said

14   earlier, there's strong policy that the Eighth Circuit has to

15   let the cases that are civil be in their own courts.  I invoke

16   that law, Your Honor, if I may.

17           Your Honor, the language of the plea agreement is

18   vague.  English is my third language.  I was not being

19   antagonistic against the plea language.  I was just trying to

20   stick to what the language says.  It doesn't come out to call

21   me the author and the sender; so therefore, I kept telling the

22   world, including Post Dispatch and this Court, if this doesn't

23   call me the author and the sender, that I'm not the author and

24   the sender.  I have shamefully admitted that I've been a

25   contributor to it.

1          THE COURT:  Yes.  And you do understand that the

2     indictment charges that there was an official proceeding

3     taking place.  That's admitted, obviously, because you've

4     presented all these exhibits.

5          MR. BAKHTIARI:  Yes, Your Honor.

6          THE COURT:  Secondly, you engaged in conduct which

7     constituted a substantial step towards the commission of the

8     crime of obstruction of an official proceeding.  That's

9     admitted.  That you did so corruptly, that is, with an

10    improper purpose, and to engage in conduct knowingly and

11    dishonestly with the specific intent to subvert, impede, or

12    obstruct the official proceeding.  And four, the natural and

13    probable effect of your conduct would be the interference with

14    the undue administration of justice.  You have categorically

15    admitted all of those --

16         MR. BAKHTIARI:  And I still do, Your Honor, and I

17    always have.

18         THE COURT:  Yes.

19         MR. BAKHTIARI:  But the details of how the conducts

20    have been committed vary from being a minor contributor to

21    actually going, finding Mr. Hiles' house, Mr. Hiles' children.

22    None of these were the case, Your Honor.

23         I was investigating my opposing counsels in order to

24    make -- see why are they so hellbent to settle cases that are

25    in conduct discovery.

1          The record shows, Your Honor, I may be litigious, but

2     I've always used the law, legal research, and correspondence

3     to advance my cause even if it is soliciting nuisance

4     settlements, as the Government puts it.  Still I went about

5     that using legal research, using correspondence.  The record

6     is full of those.

7          The conduct, the detail of the conduct, was not

8     detailed out in the plea language, and I was trying to stick

9     to the language, had Mr. Sauer been more patient with this

10    case to be more specific about my conduct in the plea

11    language, but I have always, and I still do, shamefully I

12    admit my part in that email coming about.

13         Your Honor, this is not what I do.  I have received

14    this email -- it's extremely humbling -- from a colleague of

15    mine, Dr. Marcello DiMare.  We have produced it to the

16    Government.  This says:  Al, many people have failed to get

17    anywhere with this, Al.  So I -- so, Al, many people have not

18    gone anywhere with this.  So I, for one, am impressed.  We'll

19    have to discuss the next steps later.

20         I'm a chemist.  This is the context of a breast

21    cancer drug.  While I was on pretrial release, I was

22    cooperating in Kansas City, and that company was stuck for

23    years.  We resolved that issue.  Based on that, I have two job

24    offers from San Diego from two different companies.  We have

25    submitted that to the Court, Your Honor.

1          THE COURT:  You know, there's no question, sir, about

2     your ability, and there's no question about the character of

3     that you display in your work with Mr. Salazar.  I mean,

4     you're to be congratulated, and you are hereby congratulated.

5          But the picture I have here is that you engaged in

6     this conduct, I'm absolutely convinced that you did, and now

7     you're trying to deflect away from what I have to decide in

8     terms of imposing a sentence to other issues, which are, quite

9     honestly, just don't make any sense to me.

10          MR. BAKHTIARI:  Your Honor, I thought that when I

11     read the list of the factors that were factors into 18 U.S.C.

12     3553, that my character and my employment and my career and my

13     contributions to society count.

14          THE COURT:  They do count.  No, that's right.  I take

15     those into account under 3553(a).  Absolutely, they count.

16     But your argument started out a while ago that you fit outside

17     the heartland of 10,000 cases which were used when the

18     sentencing commission set up the guidelines.

19          I haven't heard anything at all that suggests that

20     you fall outside those guidelines outside the heartland of

21     cases.  If you want to talk, you know -- now, if you moved on

22     to something else, you want to talk about something else,

23     we'll hear it, but first of all, I have to hear from

24     Mr. Sauer, and then I'll hear from you and you can present

25     your other witnesses if you want to.  Do you understand?

1      MR. BAKHTIARI:  Yes, Your Honor.  I have actually no

2  further witnesses as far as the sentencing factors go.  I try

3  to include them here to -- they described their understanding

4  of my character, their understanding of my work ethics.

5      THE COURT:  I will hear those after I hear from

6  Mr. Sauer.

7      MR. BAKHTIARI:  Yes, Your Honor.  And I -- if I may

8  briefly, there are all across the country different districts

9  for a person who has out of aberration obstructed justice

10  under 18 U.S.C. 1512.  The courts had punished them with

11  probation from one year to five years.  That's been a norm

12  across the country, Your Honor, and I'm not better than those

13  defendants.

14      THE COURT:  Okay.  I'm going to hear that, but I

15  asked you if you had any reason as to why I shouldn't sentence

16  you, a legal reason, and I've heard none.

17      MR. BAKHTIARI:  I deserve a sentence, Your Honor.  I

18  am guilty of that count.

19      THE COURT:  All right.  Then please have a seat.  I

20  will hear from Mr. Sauer.  Then I will hear your other

21  witnesses.  Go ahead.

22      MR. SAUER:  Judge, at this time, may I -- would you

23  like to hear my position as to sentencing?

24      THE COURT:  Go ahead.

25      MR. SAUER:  Very briefly.  I have lengthy notes on

1    this.  I'll try to make them as short as possible.  I just

2    want to address the language of the plea agreement first

3    because it is offensive to me personally that Mr. Bakhtiari

4    stands before you and to this day will not admit, without

5    weaseling around and trying to get mealy mouthed about it,

6    that the allegations he made against Inspector Follmer and the

7    other agents were false.  These are allegations of, quote,

8    torture and sexual abuse, his very words.

9         Here is what he said under oath at the plea colloquy:

10   Among other things, the defendant alleged that the federal

11   agents handcuffed him and his wife to furniture while they

12   were both fully nude and engaged in abusive behavior toward

13   them.  These allegations were false.  The defendant admits

14   that the factual allegations in this motion and accompanying

15   affidavits were false and that he made these allegations for

16   the sole purpose of trying to retaliate against federal

17   officers and corruptly influence the proceedings in his

18   criminal case.

19        To this day, he will not stand up and admit:  We lied

20   in those affidavits.  He did it when he was under threat of

21   being prosecuted for perjury and obstruction of justice by me,

22   but now that he believes he's gotten out of that because we

23   entered into a plea agreement, he's trying to backtrack on

24   that.

25        The result of that is the pain and psychological

1  anguish that's at the heart of this case and everything

2  continue to hang over these agents to this day.  They do not

3  know when a lawsuit may be coming from Mr. Bakhtiari accusing

4  of this.  No matter how meritless and frivolous that lawsuit

5  would be, the fact of the -- and the nature of the allegations

6  would be painful to these agents.  And it is personally

7  offensive to me when he just stood up here and would not

8  disavow the statements that were made in those affidavits.

9        I feel the same way about the evidence he's tried to

10  put on about the civil lawsuits, because it was part of the

11  plea agreement that he would admit that the civil lawsuits

12  were based on manufactured documents.

13        And here's what he said in the plea agreement:  That

14  one of the purposes of sending the threatening email was,

15  quote, to deter Mr. Hiles from potentially discovering

16  evidence that the defendant had forged the documents on which

17  the lawsuit was based.  And then we went on to --

18        THE COURT:  Slow down a little bit.  The court

19  reporter's eyes are popping.

20        MR. SAUER:  I apologize.  And I have a history with

21  this particular court reporter, Judge.

22        The stipulation of facts in the plea agreement goes

23  on to say:  The defendant knew that the, quote, maliciously

24  defamatory letters on which his lawsuits were based were not

25  authored by the defendants, plural, in his civil case and that

1    the factual claims he made in these lawsuits were false.

2         But those are, Judge, largely collateral matters.

3    What is at the heart of this case is the threat to Attorney

4    Brad Hiles and his family and the sort of participation in

5    that threat to Glennon Fogarty.

6         And I would like to focus the Court's attention on a

7    few features of that crime in support of my request, which is

8    request for a sentence within the guideline range of 51

9    months, which I understand to be the bottom end of the

10   guideline range that's been calculated by the Court.

11        First of all, there is the fear, the psychological

12   trauma, the robbery of the peace of mind for Mr. Hiles and his

13   family; that it began on that day, in the morning of the 16th,

14   to this very day.  They have been completely robbed of their

15   peace of mind as a result of the defendant's actions.

16        You've heard testimony about that from Mr. Hiles and

17   from Mr. Fogarty.  I couldn't say it better than they did.  I

18   believe the Court deeply appreciates that.

19        Secondly, I would call to the Court's attention that

20   this was not a rash offense.  There's been a two-level

21   enhancement for extensive scope and planning.  This was a

22   malicious, premeditated, carefully calculated offense.  I set

23   forth 17 discrete actions that the defendant would have had to

24   go through in order to carry out this offense in the

25   sentencing memorandum, and I won't belabor those in detail,

1   but just to remind the Court that this offense required

2   preparation, it required careful research about the individual

3   family life of innocent and honest attorneys, it involved a

4   particularly malicious mind in discovering the wedding

5   pictures and selecting the wedding pictures in particular to

6   be the locus of the threat.

7          It involved extensive attempts to conceal the fact

8   that he was sending it, but also the subtle message, the

9   alarming message with the loaded rifle to Attorney Fogarty

10  that had the dual purpose of, number one, I'm letting you guys

11  know that even though it's an anonymous email, I'm the one

12  that sent the email, and secondly, I can carry out that

13  threat.  You need to live in fear in your homes as long as I

14  am at liberty.

15         In addition to that, for the -- on the basis of the

16  language I have just read from the stipulation of the facts in

17  the plea agreement, I would remind the Court that this threat

18  was an active obstruction of justice that was in furtherance

19  of another act of obstruction of justice, which was to prevent

20  the discovery of his falsification of documents in the civil

21  lawsuit that's pending in front of Judge Limbaugh, and that is

22  admitted in the plea agreement.

23         In addition, I would remind the Court that there have

24  been elaborate attempts to evade responsibility for his

25  action, and the Court had just made a finding on that.  I

1   don't need to go into the detail.  But there have been

2   elaborate attempts by this defendant to evade any

3   responsibilities for his action.  I strongly oppose any

4   request for a downward departure, and I respectfully request a

5   sentence of 51 months in this case.  Thank you, Your Honor.

6          THE COURT:  Now, you have -- you can make your

7   statements or present any other witnesses you want to present

8   in allocution.  I will hear them at this time.

9          MR. BAKHTIARI:  Well, Your Honor, I request the Court

10  to factor in the testimony of Ms. Sharon Weiss and also Mr.

11  Salazar.  They were descriptive as far as my family

12  obligations and my social contributions and my character, Your

13  Honor.

14         This whole suit, this whole criminal suit, is simply

15  an aberration in my life history since I've been living in

16  exile in the United States.

17         May I make a short statement toward the Hiles family

18  and then address the Court?

19         THE COURT:  Sure.

20         MR. BAKHTIARI:  Mr. Hiles, I have two daughters, one

21  12, one 8.  I close my eyes and I imagine the cross hairs on

22  their heads, and my heart stopped.  What you went through must

23  have been like a hundred times more because you opened the

24  email.  You didn't know who sent it.  You were speculating it

25  was me.  You didn't know if I was capable of carrying it out,

1    but in your heart you knew I was in the guard back in Iran,

2    and you have to again go convey it to your family.

3         Nobody can minimize that pain.  Nobody should try to

4    minimize that pain.  But before thinking like a victim, you

5    must think like a jurist.  You are a jurist.  You're actually

6    an officer of this court.  The law of the Eighth Circuit says

7    that the defendant shall not be punished on this for the

8    actions that have been clearly found by the jury or by the

9    Court beyond the preponderance of the evidence.

10        The Court found, and the plea agreement says, that I

11   was a contributor.  Specifically for settlement purposes, I

12   accepted that I was a contributor.  You must uphold the law.

13   Before thinking like a victim, you must uphold the law that

14   three people were involved in this.  You, your son, and your

15   daughter-in-law are all jurists.  You must think as jurists

16   and uphold the law and not expect punishment beyond what the

17   Court can find.

18        You know very well the people who have -- who carry

19   weight in our civil suits.  Mr. Peterson, the attorney, the

20   general counsels of the college, or Judge Limbaugh, why

21   weren't these people threatened?

22        I was somehow through an unknown route that the

23   Government does not know but it speculates contributed to

24   those, to those emails, as a minor contributor be it.  For

25   that I'm here, shamefully, to accept my punishment.  Again, I

1    say that nobody can minimize those pains that you went

2    through, and nobody should try to minimize those.

3           Your Honor, as I mentioned, I'm a chemist.  One of my

4    colleagues has written this letter about the advancements that

5    we have made in breast cancer drugs.  We have produced that to

6    the Government and to the Court.  There are companies in

7    California who are waiting for me to go there as a drug maker,

8    as a scientist.  It was foolish of me to take those suits too

9    seriously.

10           I recently heard something from my daughter --

11           THE COURT:  You know, I guess what's troubling me is,

12    you still think that I believe that I'm going to punish you

13    because you like to file lawsuits, and that does not have

14    anything to do with this case.

15           MR. BAKHTIARI:  Your Honor, I am here because I have

16    contributed to a violent act which was purposed to obstruct

17    justice.

18           THE COURT:  Right.

19           MR. BAKHTIARI:  I have done that.  I have brought

20    shame upon myself and my family.  My wife has been practically

21    hospitalized because of this stresses of this suit.  I am

22    admitting to that.

23           Your Honor, let me list -- I was a civil servant of

24    five years.  I lost that status when I was indicted.  I

25    accumulated pension for five years.  I lost that pension when

1    I was terminated.

2            My firm, it was a small firm, we are not gathering

3    any clientele in the Midwest anymore because of repercussions

4    of this suit.  After all this loss, it would, Your Honor, take

5    a special kind of fool not to accept responsibility, not to

6    hear the wake-up call.

7            THE COURT:  But I haven't heard one single verb from

8    you that you're accepting responsibility.  I expected when you

9    got up here you would turn to Mr. Hiles and say:  I'm deeply

10   sorry for all the grief that I have caused you.  Instead, you

11   start lecturing him about his responsibility as a jurist to --

12   that's bizarre to me.  Just bizarre.

13           MR. BAKHTIARI:  My words, Your Honor, because I'm not

14   familiar with this part of the American culture, probably,

15   that saying "I'm sorry," "oops, I'm sorry," "I apologize,"

16   that would be meaningless to him.  He knows that I have been a

17   contributor.  This Court knows that I have been a contributor.

18   And as a person who is a veteran litigator, he knows the

19   circumstances that so far I have suffered and I will continue

20   suffering.

21           THE COURT:  But that's not his fault.

22           MR. BAKHTIARI:  I realize that.  And I don't know if

23   he's -- if saying the word "I'm sorry" would make him and his

24   family any better.  I am here to exhibit that, Your Honor,

25   since March of 2005, we have lost everything, including my

1    status in society, including my career --

2             THE COURT:  Whose fault is that?

3             MR. BAKHTIARI:  Mine.

4             THE COURT:  Whose fault is that?

5             MR. BAKHTIARI:  Mine, your Honor.  And nobody else.

6             THE COURT:  All right.

7             MR. BAKHTIARI:  And that is what the plea agreement

8    says.  Your Honor, I have, to the best of my ability, gone

9    through the case law here.  United States v. Koestner, which

10   is the Eighth Circuit case.  Sixth Circuit, Peter Jacquemain.

11   Sixth Circuit, Robert Jacquemain.  Eastern District of

12   Michigan in U.S. v. Duane Poucher.  Ninth Circuit, Lefler.

13   There is specifically a case, U.S. v. Mack, from New York.

14             These are people who are aberrant -- in aberration

15   have done something as a stupid as I have done to myself and

16   my family.  The courts have realized that probation is

17   punishment.  And Mack -- specifically United States v. Mack in

18   the District of New York, she was a civil servant.  She

19   partook in some violent actions to intimidate others in an

20   ongoing suit.  After that she lost her civil status.  She lost

21   her pension.  She lost her career completely.  The court

22   punished her by five years of probation.

23             I am not better than her.  I'm not better than either

24   one of those people.  The United States has a norm for this

25   kind of offense in these circumstances.  The last line, Your

1   Honor, the Court has not been hearing it maybe because I have

2   planned these to speak before the Court.

3        I have shamefully brought that shame upon myself and

4   my family to commit that crime.  I contributed to something

5   violent, and I knew it was going to have hindrances in front

6   of that civil suit.  I am shameful, and I'm here before the

7   Court to ask for mercy.  I respectfully ask for mercy.

8        I have not been -- I have not been antagonistic and

9   arrogant against the Government by recanting my statements.  I

10  was trying to stick to the language, and in my perspective, as

11  a person who English is my third language, in my understanding

12  I was being obedient to what it says.  It's calling me a

13  contributor.  So I called the paper.  I said, "Look, this says

14  I'm a contributor."

15       Your Honor, Mr. Sauer is not addressing this very

16  reality that when I had a dispute with the paper, I didn't

17  find his family members' pictures to email it to him.  I

18  didn't go find his house.  I didn't show a rifle to him as

19  they allege.  I found his attorney.  I read Missouri law on

20  libel, and as the record shows, I wrote to that attorney.  I

21  didn't demand a settlement.  I didn't demand a courthouse

22  steps settlement.  I said, this is obstructing my career.

23  It's not exactly reflecting the plea language.  Please remove

24  it.

25       My contribution to the horrible action was an

1    aberration.  I'm here to respectfully ask for mercy, Your

2    Honor.  Thank you.

3         THE COURT:  All right.  I have considered the impact

4    of the parties' plea agreement on sentencing issues and all of

5    the record that was made in regard to the acceptance of that

6    guilty plea.  I've heard evidence today.  I have considered

7    statements of the Assistant United States Attorney and the

8    defendant in this case.  There are no departures made under

9    the United States Sentencing Guidelines.  I now have to decide

10   if I will make a sentence under the guidelines or if I will

11   make a sentence outside of the guidelines.

12        I must look at all the factors in 18, United States

13   Code, 3553(a) to decide whether to impose a guideline sentence

14   or a nonguideline sentence.  Those factors include, first, the

15   nature and circumstances of the offense and the history and

16   characteristics of the defendant.

17        I have received a number of letters filed on behalf

18   of the defendant.  I have read them all.  The one from his

19   wife is particularly -- I use the word "troubling" not to

20   suggest anything bad about it.  It's troubling because it does

21   contain so many facts about how she and her family have been

22   impacted by the defendant's conduct, and for that many -- or

23   including me, are remorseful.

24        I have heard evidence and many statements of the

25   defendant.  It's my belief that, as I said before, I allowed

1   his attorney to remain in the courtroom for advice.  He would

2   be much better off with counsel.  He has made so many

3   statements in this case today which are just patently

4   unbelievable to me; that I believe he has not been truthful

5   with the Court.  I believe that he has a misconception of --

6   strike that.  I believe he totally disregards the implications

7   of his plea.  I think that he has some kind of grandiose

8   belief that because of his ability and skills, that he is

9   above the law and that what he did was insignificant, which is

10  not what I believe based upon the evidence I've heard and the

11  statement of the law.

12          The statement must afford adequate -- it must reflect

13  the seriousness of the offense and must promote respect for

14  the law, and it must provide just punishment for the offense.

15  Any sentence outside the guideline range, in my view, would

16  not accomplish those purposes.

17          It must afford adequate deterrence to criminal

18  conduct.  That is sort of a neutral factor, I think, in this

19  case.  It must protect the public from further crimes of the

20  defendant.  The defendant has demonstrated that he has violent

21  proclivities, and some substantial punishment is required to

22  satisfy that element.

23          He has a master's degree.  He does not need

24  educational or vocational training.  He does not need medical

25  care or other correctional treatment.

1        I have looked at all the factors under 18, United

2   States Code, and I want to finish by talking about the man

3   that appears before me today.  And he is a man of contrast.

4   He has a daughter who is 9 years old born naturally to him by

5   his first marriage.  By all indications he does pay, on a

6   regular basis, child support of $457 a month for the support

7   of that child.

8        He is currently married to Ms. Weiss.  That marriage

9   is intact.  By all accounts it is a very supportive marriage

10  and he is in all respects a very good husband to Ms. Weiss.

11       He is an electrical engineer -- his father -- strike

12  that.  His father is an electrical engineer.  His mother is a

13  homemaker in Iran.  They have an intact marriage.  His father

14  was a functional alcoholic.  He's one of five children.  He

15  describes his childhood as normal.

16       He suffered a gunshot wound.  To his credit, he took

17  a stand against a suicide bombing in the state of Iran -- or

18  in the state of Israel.  For that he suffered a good deal.  He

19  converted to Christianity, was jailed for that.  And Islamic

20  leaders punished him severely for his religious conversion.

21       He has no drug issues at all.  He has no alcohol

22  issues at all.  The only criminal record he has was driving

23  without proper driver's license for which he received no

24  points.

25       He has the lowest criminal history category of 1.  He

1   is, by all accounts, the sole provider for his wife and her

2   and the children.  He worked at Yantra Group where he earned

3   $10,000 a month.  He worked for the City of St. Louis where he

4   earned $3,217 a month.  He worked for Chemir, C-H-E-M-I-R,

5   Laboratories where he earned $3,750 a month.  He worked for

6   Analytical Chemists, where he earned $45,000 a month (sic).

7   He's a very talented individual with enormous skills and

8   abilities.  All those things the Court finds in fashioning a

9   judgment.

10          Under the Sentencing Reform Act of 1984 and the

11   provisions of 18, United States Code, 3553(a), it is the

12   judgment of the Court that the defendant, Alireza Bakhtiari,

13   also known as Al Bakt, B-A-K-T, is committed to the custody of

14   the Bureau of Prisons to be imprisoned for a term of 51

15   months.

16          Upon release from imprisonment, he shall be placed on

17   supervised release for a term of three years.  If not

18   deported, within 72 hours of release from the custody of the

19   Bureau of Prisons he shall report in person to the probation

20   office in the district to which he is released.

21          While on supervision he shall comply with the

22   standard conditions that have been adopted by this Court and

23   shall comply with the following additional conditions:  If it

24   is determined there are costs associated with any services

25   provided, he shall pay those costs based on a co-payment fee

1 established by the probation office.  He shall participate in

2 a mental health evaluation and shall follow any

3 recommendations of such and shall participate in the mental

4 health program approved by the probation office.

5         He shall participate in the cognitive behavioral

6 treatment program as directed by the probation office.

7         He shall submit his person, residence, office, or

8 vehicle to any search conducted by the probation office based

9 upon a reasonable suspicion of contraband or evidence of a

10 violation of a condition of release.  He shall warn any other

11 residents that the premises may be subject to searches under

12 this condition.

13         He shall participate in all deportation proceedings

14 and remain outside the United States if deported.  In that

15 regard I would like to put a statement in the sentencing and

16 judgment that the Department of Immigration and Customs

17 Enforcement must carefully consider the very substantial risks

18 of the defendant if he is deported to Iran or any Islamic

19 country.

20         Based on the low risk he poses for future substance

21 abuse, the Court suspends mandatory drug testing.

22         He has -- he does have an ability to pay a fine.  He

23 has a net worth of $50,709.  I am finding in this case,

24 however, based upon the severe consequences of the sentence

25 and judgment upon his family, that any imposition of a fine

1    would be a direct retribution against his family, and I'm not

2    going to impose a fine in this case.

3        I am ordering him to pay a $100 special assessment

4    which is due and payable immediately.

5        Any notice of appeal that you have a right to file

6    must be filed within 14 days of this date.  If you're unable

7    to pay the cost of an appeal, you may apply for leave to

8    appeal in forma pauperis, and the clerk of the court shall

9    assist you with those filings.

10        There is an issue of release in this case.  I will

11    hear first from Mr. Sauer.

12        MR. SAUER:  Judge, I respectfully request, and

13    vigorously request, that the Court order remand at this time.

14    The defendant has been on notice that I would not agree to

15    voluntary surrender; so he's had -- he can't claim that he's

16    been surprised at the possibility of remand.

17        In order for him to surrender voluntarily, the Court

18    would have to make a finding that there is clear and

19    convincing evidence that he is not a threat to the community

20    and not a flight risk.  Evidence of both of those points is

21    wholly absent in this case.  The nature of the crime is a

22    threat of violence.  His situation is now quite different than

23    it was when he first walked in here when he believed he might

24    be able to convince the Court to grant him probation.  Now he

25    knows he's looking at a significant term of imprisonment.

1          I believe that I speak for Mr. Hiles and his family

2     and Mr. Fogarty and his family when I say that they would fear

3     what he might do in the time between now, knowing that he has

4     to go to prison, and surrendering himself.

5          So given the nature of the crime, I don't think there

6     is any basis for a finding that he's not a threat to the

7     community.

8          In addition, I believe he's a flight risk.  I'm aware

9     of at least two representations he has made while he's been on

10    bond that he intends to travel abroad, to leave the country.

11    He made one to his ex-wife, Terry Bakhtiari, in an email of

12    May 4 of 2012.

13         In addition to that, not long ago, about a month or

14    six weeks ago, I received a phone call from the city of Ladue

15    prosecutor who notified me that he was in St. Louis County

16    Court present with Mr. Bakhtiari where they were trying to set

17    a trial date for his currently pending -- currently pending

18    harassment lawsuit.  That's reflected in the PSR.  And in

19    trying to set a trial date for that, Mr. Bakhtiari represented

20    to counsel and to a St. Louis County judge that he wouldn't be

21    available because he had intentions to travel outside the

22    country.

23         So under all the facts and circumstances, I would say

24    that, number one, he is a threat to the community.  Number

25    two, he is a flight risk.  And therefore, I request remand at

1    this time.

2            THE COURT:  All right.  Just a moment. I will hear

3    you now, Mr. Bakhtiari.

4            MR. BAKHTIARI:  Yes, Your Honor.  Your Honor, if I

5    may, I move that the statements of all the witnesses and the

6    exhibits be admitted on the record at this time, all of them.

7            And the Court is in possession of an expired passport

8    that I had.  I don't have any passport at this time from any

9    country.  I have been, for business, going to San Diego, and

10   it's been right across the border from Mexico, and I have

11   always come back and I've been in constant contact with my

12   probation officers.

13           In order to clear up our residence in Kansas City and

14   clear up our residence in San Diego and establish a proper

15   residence for my ill wife here in St. Louis, I would need some

16   time to prepare those before I surrender myself to the Bureau

17   of Prisons.

18           And based on her doctor's advice, we'll have to

19   choose a place, a camp, that is proper for her and me.  And

20   for those considerations, Your Honor, I will request that you

21   allow me to surrender myself voluntarily.

22           I believe the law allows me or the regulation allows

23   me 30 days.  If I may have that 30 day to make these

24   preparations for the family.

25           THE COURT:  Okay.  Based upon what law do you

1    reference?  I'm not familiar with that law.

2              MR. BAKHTIARI:  May I consult with Ms. --

3              THE COURT:  Sure.

4                        **(OFF THE RECORD.)**

5              MR. BAKHTIARI:  My apologies, Your Honor.  I

6    misspoke; that there is no law.  And the standard of practice

7    typically what the courts have granted defendants previously

8    was about 30 days to surrender myself.  If I may ask the Court

9    to find that based on these two standards, that being the

10   flight risk and a threat to the alleged victims here or the

11   victims, I am wearing a bracelet on my ankle, and as I've

12   mentioned, I have no means to on board any international

13   flights.  They would not even allow me.

14             On these bases I allow the courts to show leniency to

15   my family so I can prepare for them their residence prior to

16   submitting myself to the Bureau of Prisons, Your Honor.

17             THE COURT:  Do you have a recommendation when you're

18   notified by the Bureau of Prisons or when you are ordered --

19   when the Bureau of Prisons designates you, do you have a

20   preference as to where in the United States, either a specific

21   prison or a location where you would like to serve the

22   sentence?

23             MR. BAKHTIARI:  Yes, Your Honor.  We have been moving

24   our furniture to California, and that is where the doctors are

25   that serve my wife.  Anywhere within the state of California,

1    any of those prison camps, or camps.

2              THE COURT:  What would be the camp or what would be

3    the location where you will be living?  Because I will make a

4    recommendation that you receive a camp placement at as nearly

5    possibly located by a city.  What --

6              MR. BAKHTIARI:  The city is Thousand Oaks,

7    California, Your Honor.

8              THE COURT:  How do you spell that?

9              MR. BAKHTIARI:  T-H-O-U-S-A-N-D Oaks.

10             THE COURT:  Okay.

11             MR. BAKHTIARI:  California.

12             THE COURT:  All right.  The Court is recommending

13   that placement be at that location, at a camp as close as

14   possible to that location in that city in California.

15             You may have a seat.

16             MR. BAKHTIARI:  Yes, Your Honor.

17             THE COURT:  The Court is constrained by the law, and

18   it requires that I make specific findings that there is no --

19   and I have to find by clear and convincing evidence that the

20   defendant will not pose a threat to any other person or pose a

21   risk of flight, and I can't make those findings.

22             And today the defendant faced Mr. Hiles and lectured

23   to him.  There's no indication at all of any remorse to Mr.

24   Hiles.  And based upon the fact that he may believe that Mr.

25   Hiles has some role in him being imprisoned, there is -- I

1   cannot make a finding there is no likelihood of threat, no

2   likelihood of danger to any other person in the community.

3          Additionally, if allowed to live right across the

4   border from California, it's easy to walk across that border.

5   I've been there.  I understand it.

6          I cannot conclude, based upon his behavior in court,

7   his statements about what he believed -- believes the offense

8   charged, how that isn't really as severe as he -- that is more

9   severe than he really believes it is, all of those things I

10  cannot find, by clear and convincing evidence, that he will

11  not flee or pose a danger to any other person.  So I must deny

12  the request for self-surrender and accordingly do so.

13         Are there any other matters?

14         MR. SAUER:  No, Your Honor.

15         THE COURT:  All right.  Could I see Ms. Smith for

16  just a moment, please?

17              **(AN OFF-THE-RECORD DISCUSSION WAS HELD.)**

18         MR. SALAZAR:  Your Honor, present in court I would

19  like to approach the bench, if possible, from the podium.

20         THE COURT:  Sure, come on up.  This is, for the

21  record, Mr. Salazar.  Go ahead, sir.

22         MR. SALAZAR:  Yes, sir.  The reason I've asked to

23  come up here is, in the time that I've known Mr. Bakhtiari,

24  and even prior to even meeting him, I have studied the Islam,

25  the Nation of Islam, Islamic Law, Sharia law, and number of

1  different areas of the Quran.

2          In that, in hearing the testimony today about lack of

3  remorse and the things that even has been impressed upon you,

4  and really the lack of Mr. Bakhtiari of coming out and saying

5  about, "I'm sorry, I have done these acts, I've done these

6  things," would be actually against everything he's been raised

7  in in his culture.  There is no mention of that.  And if

8  anybody is a student of the Quran, you'll find that it -- in

9  that contrary to what they believe and what we believe is that

10  there's no places in there for their so-called "golden rule."

11  There is no place in there as far as love myself, you know,

12  love God, love one another.

13          And in that same regard, there is no real area within

14  the culture in the Sunni religion or the Shiite religion under

15  Sharia to go forth and to say things such as, you know, "I'm

16  sorry."  That talking about the third language that he has

17  referred to a number of times that I was sitting back there

18  listening to, in regards to what he would read in the legal

19  documents and that he has gone ahead and made his contentions,

20  this is how I understand it.  This is how, you know, what it

21  means to me.  It's going to be contrary to the way you would

22  read it or I would read it or anybody else would.  This would

23  not come across with him the same way.

24          What he was doing today is making a defense for

25  himself that through his culture, his beliefs exactly the way

1    it would be, say, elsewhere, such as Iran.  But coming that it

2    is here, and even though I know he's educated, I know he

3    speaks well, I know he travels, and I know he's done a number

4    of things, I know he's a chemist, and I do know this:  That he

5    would not come here and go ahead and do the things he did as a

6    contrivance or as a device or a means, irregardless of what is

7    believed, you know, even by the prosecution.  I respect their

8    position, I respect the Court, but I also know from fact and

9    from being around, that when he talks about that third

10   language and things he's doing here and the way he presented

11   it to the Court, truly erroneous.

12        And I have to agree with the Court.  The best thing

13   he could have done was have an attorney.  I agree with that,

14   but please, Your Honor, I ask again, and for the family

15   especially, that he be given the chance to self-surrender.  I

16   do not believe he's going to be a flight risk.  He is not

17   going to walk across that border.  He's had ample opportunity

18   to do so before even coming here today knowing that there was

19   a chance of having a substantial sentence pronounced against

20   him.

21        I just beg the Court to reconsider what you've

22   already said as far as the self-surrender, Your Honor.  I

23   thank for your time and your patience.

24        THE COURT:  All right.  Well, I appreciate several

25   things.  I appreciate -- and I'm not pandering to you, I

1   promise you that.  I respect the faith that you practice, and

2   I do take to heart everything you said on the witness stand.

3   I was very impressed with your testimony and also with your

4   statement.

5          Here is the conundrum that I face.  Congress has

6   passed laws about whether a person is allowed to

7   self-surrender.  And if there are cases where there are

8   elements of violence associated with the offense, that of

9   itself suggests that the person would not be a suitable

10  candidate for self-surrender.

11         But in this case his actions, which are undenied, of

12  having a lawyer go into a room after there was evidence of

13  pictures with cross hairs on two foreheads and then produce a

14  rifle, eject a live cartridge and say, "Here, do you want a

15  bullet?" all of those things suggest to me that there is a

16  proclivity for violence.

17         And so in order to let him go, unlike in state

18  court -- and I used to do that for about 17 years -- I had

19  total discretion of whether or not I would let someone go or

20  not, and you could always take into account the effect on the

21  family and all of those other things.

22         Here the cases are very specific.  You can't consider

23  those issues.  You have to consider, can a judge make a

24  conclusion, by clear and convincing evidence, that the person

25  is not likely to flee or pose a danger to any person in the

1    community?  And based upon what I have seen, and taking into

2    account your statements as well, I can't find, by clear and

3    convincing evidence, that he will not pose a threat or a

4    danger.  These people are living in terror, and I just can't

5    come to that conclusion.

6            I respectfully thank you for your statement, but I

7    must, as my own, follow the law, which I'm trying hard to do.

8    Thank you, sir.

9            MR. SALAZAR:  Yes, Your Honor.  Thank you.

10           MR. BAKHTIARI:  Your Honor --

11           THE COURT:  All right.

12           MR. BAKHTIARI:  Thank you again for your patience.

13   May I ask the Court to reappoint Ms. Smith so she can address

14   the appellate matters after my surrender, Your Honor?

15           THE COURT:  Well, I will do this.  I will instruct

16   Ms. Smith to file a notice of appeal for you, and the Eighth

17   Circuit Court of Appeals will be deciding the identity of your

18   counsel.  I have to take into account what she indicates

19   that -- in allowing her to withdraw.  So I can't very well

20   say, okay, I'm going to disregard all of those things and now

21   have her represent you on appeal.

22           I don't -- I'm not convinced that your views and her

23   views are the same about your appeal, but I will instruct her

24   to file a notice of appeal so you're protected in that regard.

25   What happens after that is up to the Court of Appeals.

1          MR. BAKHTIARI:  It was actually her own idea, and she

2   reoffered her services, and I graciously accepted.  She's been

3   a great counsel, and I'm grateful to her.  We did not have

4   enough time to prepare for today to communicate the factual

5   background.  That's why I decided to take over.

6          And I apologize if my language has come across

7   arrogant.  It's just a complete different culture that I grew

8   up.  Thank you, Your Honor.

9          THE COURT:  Well, I want to make the record clear.  I

10  don't want you to lay a trap for me.

11         MR. BAKHTIARI:  No, Your Honor.

12         THE COURT:  If you had requested more time, you would

13  have gotten it --

14         MR. BAKHTIARI:  Yes, Your Honor.

15         THE COURT:  -- to do whatever you needed to do.  So I

16  don't want the record to show that you somehow were denied due

17  process because you didn't have enough time to prepare your

18  case.  That's just nonsense.

19         MR. BAKHTIARI:  That is correct, Your Honor.  We did

20  not ask for extension.  That was our fault, thank you.

21         THE COURT:  All right.  Court's in recess.

22              **(PROCEEDINGS CONCLUDED AT 1:20 PM.)**

23

24

25

<u>CERTIFICATE</u>


        I, Shannon L. White, Registered Merit Reporter and

Certified Realtime Reporter, hereby certify that I am a duly

appointed Official Court Reporter of the United States

District Court for the Eastern District of Missouri.

        I further certify that the foregoing is a true and

accurate transcript of the proceedings held in the

above-entitled case and that said transcript is a true and

correct transcription of my stenographic notes.

        I further certify that this transcript contains

pages 1 through 162 inclusive and that this reporter takes no

responsibility for missing or damaged pages of this transcript

when same transcript is copied by any party other than this

reporter.

        Dated at St. Louis, Missouri, this 10th day of December,

2012.



        _____
        /s/Shannon L. White
        Shannon L. White, RMR, CRR, CCR, CSR
        Official Court Reporter